[926 NYS2d 446]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SAMUEL ENCARNACION, Appellant.

First Department, June 23, 2011

82

## APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Joseph M. Nursey* and *Alexis Agathocleous* of counsel), for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Rither Alabre* and *Peter D. Coddington* of counsel), for respondent.

## OPINION OF THE COURT

ROMÁN, J.

The salient issue on this appeal concerns the United States Constitution's Confrontation Clause and whether the trial court, in allowing the prosecution to use a witness's grand jury testimony in its case-in-chief, without producing the witness, violated defendant's right of confrontation. Additionally, we are called upon to decide whether in allowing the prosecution to present DNA evidence through a witness who did not personally perform all of the DNA testing about which she testified, the trial court further violated defendant's constitutional right of confrontation. After a review of the record, we hold that under the circumstances, defendant's right of confrontation was not violated when the prosecution used grand jury minutes in its case-in-chief. Notwithstanding that defendant failed to preserve the DNA issue, as an alternative holding we conclude that the prosecution's use of the DNA evidence did not violate his constitutional right of confrontation.

On January 20, 2005, in response to a 911 call, the police and emergency medical technicians (EMTs) arrived at premises located at 1235 Harrod Avenue, Bronx, New York. Defendant met both the police and the EMTs in the lobby and told them that while he was out getting food someone stabbed his girlfriend and her cousin, killing the cousin. Defendant told the police that he had been told by his girlfriend that this crime had been committed by "some black guy." Defendant led the police and the EMTs to apartment 8J, where they discovered a woman,

later identified as Ofelia Torres (Ofelia),* who was defendant's girlfriend, lying on the ground with multiple stab wounds. A man, dead and with multiple stab wounds, later identified as Johnny Torres (Johnny) and Ofelia's cousin, was lying in a pool of blood in the hallway. Blood was found at multiple locations in the apartment, including the hallway and the bedroom.

Inspection of the premises led to the discovery of a garbage bag in the compactor room. The bag was consistent with bags also found in the apartment and contained bloody clothing, namely a pair of sweat pants, a white t-shirt, a pair of jeans, and a pair of sneakers. The bag also contained several bloody knives. These items were ultimately tested for DNA, yielding DNA profiles matching defendant, Johnny and an unidentified female.

Ofelia was transported to the hospital, where, upon examination, it was noted that she had numerous stab wounds throughout her body. When asked by a doctor to identify her attacker, Ofelia verbally identified defendant. An autopsy revealed that Johnny died from stab wounds to his neck and torso.

The police interviewed defendant, who, upon being told that Ofelia was still alive, broke down and gave an altogether different account from that which he had given to the police at the scene. In a written statement, defendant stated that on the night in question he arrived at his apartment after visiting a friend. Ofelia was already home with Johnny. Upon his arrival, defendant started to play with the dog when Ofelia became upset, contending that defendant was "no good" because he had not left her any money to purchase food. Johnny then also stated that defendant was "no good" and that Ofelia should end their relationship. Defendant and Johnny got into a verbal altercation and thereafter Johnny hit him. While in the kitchen, a fight ensued, Ofelia tried to intervene and defendant "blacked out." Defendant was unsure how he got hold of a knife, only recalling that he "lost [his] sense and everything happened." Thereafter, defendant noticed that both Johnny and Ofelia were on the floor. Scared, defendant went to a neighbor's apartment and asked him to call an ambulance. In a panic, defendant took off his pants, and put "everything" in a bag, including the knife, thereafter throwing the bag in the garbage. Defendant also gave the police a videotaped statement, largely consistent with his

---

* To the extent that there are three persons involved in this case who share the last name Torres, we hereinafter respectfully refer to these witnesses by their first names.

written statement, adding that while he did in fact stab Ofelia and Johnny, he could not recall how, remembering only that "everybody's bleeding and I got a knife in my hand." While in police custody, defendant also wrote Ofelia a letter, wherein he apologized for the instant event and pleaded for forgiveness.

Prior to trial, Ofelia testified before the grand jury about the foregoing events. Ofelia stated that when defendant came home that night, she was with her dog and her cousin Johnny. While in the bedroom, she and defendant proceeded to have a discussion regarding their relationship. Ofelia told defendant that she wanted to end their relationship and defendant responded by insulting her prior boyfriends. Thereafter, defendant went to the kitchen and got a knife. Telling Ofelia that "[i]f I can't have you, nobody can have you," he stabbed her repeatedly, ultimately stabbing her 20 times throughout her chest and back and nearly severing a finger. Johnny, who had been elsewhere in the apartment, tried to intervene and defendant stabbed him to death. Defendant, acknowledging that he had killed Johnny, stated, "Johnny's dead. Look what I did. How am I gonna get away with this." Defendant stabbed Ofelia again, carried her to the living room, and told her he was going to let her die. Changing his mind, however, defendant went to a neighbor's apartment and called an ambulance.

Defendant was tried and on the foregoing evidence convicted of all charges in the indictment, namely second degree murder (Penal Law § 125.25 [1]), attempted second degree murder (Penal Law §§ 110.00, 125.25 [1]), and two counts of first degree assault (Penal Law § 120.10 [1], [2]). Defendant was sentenced to an indeterminate prison term of 20 years to life for the murder, to run consecutively with three concurrent determinate 20-year prison terms. He was also sentenced to five years of post-release supervision.

### Confrontation Clause and the Use of Grand Jury Minutes

■ Defendant contends that in allowing the prosecution to use Ofelia's grand jury testimony in its case-in-chief, the trial court violated his constitutional right of confrontation because the prosecution failed to establish that defendant's misconduct induced Ofelia's refusal to testify, thereby rendering her unavailable. We disagree.

The Confrontation Clause of the Sixth Amendment to the United States Constitution requires that in all criminal prosecutions a defendant is entitled to confront all witnesses who testify

against him or her (*Melendez-Diaz v Massachusetts*, 557 US —, —, 129 S Ct 2527, 2531 [2009]; *Davis v Washington*, 547 US 813, 821 [2006]; *Crawford v Washington*, 541 US 36, 50 [2004]). Generally, out-of-court statements, such as grand jury testimony, cannot be used as evidence-in-chief against a defendant in a criminal action, as such evidence would in fact run afoul of a defendant's constitutional right of confrontation (*People v Cotto*, 92 NY2d 68, 77 [1998]; *People v Geraci*, 85 NY2d 359, 365 [1995]; *People v Byrd*, 51 AD3d 267, 272-273 [2008], *lv denied* 10 NY3d 956 [2008]). However, the right to confront witnesses is not absolute and there are of course exceptions.

The United States Supreme Court has repeatedly held that the right of confrontation can be waived or forfeited not only by consent but also by misconduct (*Illinois v Allen*, 397 US 337, 343 [1970]; *Snyder v Massachusetts*, 291 US 97, 106 [1934]; *Diaz v United States*, 223 US 442, 452-453 [1912]). Thus, when a witness's "silence is procured by the defendant himself, whether by chicanery . . . or by actual violence or murder, the defendant cannot then assert his confrontation clause rights" (*United States v Mastrangelo*, 693 F2d 269, 272-273 [2d Cir 1982] [citations omitted]), because through his or her misconduct, defendant has forfeited both the constitutional right to confront a witness and the right to assert otherwise viable evidentiary rules barring the use of hearsay as evidence-in-chief (*Cotto* at 75-76; *Geraci* at 365-366).

Whereas the court in *Mastrangelo* limited forfeiture to instances where a defendant procures a witness's silence by threats, trickery, murder or violence (693 F2d at 272-273), in this state we define misconduct much more broadly to include intimidation and bribery (*Geraci* at 369-370), and the use of a relationship to improperly procure a witness's silence (*People v Johnson*, 93 NY2d 254, 259 [1999]; *Byrd* at 273; *People v Jernigan*, 41 AD3d 331, 332 [2007], *lv denied* 9 NY3d 923 [2007]; *People v Major*, 251 AD2d 999, 999-1000 [1998], *lv denied* 92 NY2d 927 [1998]).

When the prosecution alleges "specific facts which demonstrate a distinct possibility that a criminal defendant's conduct has induced a witness' unlawful refusal to testify at trial or has caused the witness' disappearance or demise" (*Matter of Holtzman v Hellenbrand*, 92 AD2d 405, 415 [1983] [internal quotation marks and citation omitted]; *Cotto* at 72), before allowing the use of any out-of-court statements in its case-in-chief, the trial court is required to conduct a *Sirois* hearing (*Johnson* at

258). At a *Sirois* hearing, the prosecution must prove the defendant's misconduct by clear and convincing evidence and, if successful, the defendant is deemed to have waived or forfeited his right to confront the witness whose absence or silence he procured and the witness's out-of-court statements may then be used by the prosecution in its case-in-chief (*Cotto* at 75-76; *Geraci* at 365-368; *Byrd* at 273; *Major* at 999; *Holtzman* at 415).

Recognizing the surreptitious nature of witness tampering and that a defendant engaging in such conduct will rarely do so openly, resorting instead to subterfuge, the court can rely on and the prosecution can use circumstantial evidence in making the requisite determination (*Cotto* at 76-77; *Geraci* at 369). Indeed, at times the prosecution will be able to rely on nothing more than circumstantial proof and the logical inferences that can be drawn therefrom (*Geraci* at 369-370; *see also People v Alston*, 27 AD3d 311, 312 [2006], *lv denied* 7 NY3d 751 [2006]).

Here, the prosecution alerted the court of its intention to use Ofelia's grand jury testimony in its case-in-chief. The prosecution averred that based on defendant's misconduct, Ofelia had stopped cooperating with them and was refusing to testify at trial. The trial court then correctly held a *Sirois* hearing. Nancy Torres (Nancy), Ofelia's mother, testified that in January 2005, after the instant crimes, defendant began to call her home several times a day, requesting to speak to Ofelia. Thereafter defendant began to call Ofelia on her cell phone. Specifically, Nancy testified that defendant called her home in excess of 1,000 times. Telephone records received in evidence corroborated Nancy's testimony, establishing that defendant called Ofelia's residence from jail in excess of 150 times. On one occasion, Nancy overheard a telephone conversation between Ofelia and defendant where Ofelia discussed tailoring her testimony to lessen defendant's prison time. Nancy testified that while on the telephone with defendant, Ofelia stated that if "she [Ofelia] says what he [the defendant] wants her to say, that he ain't going to do no time at all." Thereafter, Ofelia's original version of the events, the version she had already testified to before the grand jury, changed, and she now contended that it was Johnny, rather than defendant, who stabbed her. Later and after a brief hospitalization, Ofelia admitted that she had lied, changing her original story only because defendant so demanded. Nancy testified that Ofelia stated "that Sammy [defendant] wants her to say that Johnny did the stabbing and he [defendant] will come out of jail faster." Additionally, Ofelia told Nancy that she would

no longer cooperate with the prosecution or testify at trial because defendant, through his friends, told her that if she "comes in" he would "get her." On direct examination, Nancy testified that Ofelia told her that defendant's friends told Ofelia that if she didn't "cooperate with him [defendant], that he [defendant] is going to get her." When cross-examined on this issue, Nancy reiterated that Ofelia told her that "she was being threatened by one of the friends from the defendant."

After the hearing, the court in a written decision granted the prosecution's application to use Ofelia's grand jury testimony in its case-in-chief, concluding that defendant's misconduct, namely his improper influence on Ofelia, induced her refusal to testify.

We agree that the evidence presented at the hearing circumstantially established that defendant engaged in misconduct which induced Ofelia's refusal to testify at trial by threatening her with violence if in fact she chose to testify.

Here, the evidence clearly and convincingly established that Ofelia's refusal to testify was the product of fear, precipitated by defendant's threats that if Ophelia testified against him, harm would certainly befall her. Nancy not only testified that defendant relentlessly called her home over 1,000 times, but that Ofelia told her that defendant, through his friends, told Ofelia that if she "comes in," defendant would "get her." Implicit in that statement is that defendant threatened to harm Ofelia if she cooperated with the prosecution; thus, defendant induced her silence through the use of threats.

Accordingly, to the extent that defendant's misconduct procured Ofelia's refusal to testify, he forfeited his right to confront her and the admission of her grand jury minutes as evidence in the prosecution's case-in-chief was proper (*Cotto* at 75-76). As an alternative holding, even if it was error to admit Ofelia's grand jury testimony on the People's direct case, given the overwhelming evidence of defendant's guilt, namely his confession and the physical evidence linking him to the crime scene, such error was nevertheless harmless.

Contrary to the position taken by Justice McGuire, the record, portions of which have been extensively quoted above, establishes that defendant did in fact procure Ofelia's refusal to testify at trial. While Justice McGuire argues that there is no evidence linking the threats made against Ofelia directly to defendant, his assertion is simply belied by the record. The very friends who were threatening Ofelia if "she didn't cooperate

with defendant" were the same "friends [of defendant's] from the streets," with whom Ofelia had a conversation and who told Ofelia that "Sammy [defendant] keeps saying if she doesn't stay with him, that he was going to hurt her." Thus, it is clear that defendant was conveying threats directly against Ofelia through his friends, such that these threats can be imputed directly to him.

In finding that defendant procured Ofelia's unavailability at trial, it was not necessary, and indeed would have been improper, to come to the antecedent conclusion, as urged by Justice McGuire, that defendant was guilty of the crimes charged. A defendant waives his right to confront a witness by procuring the witness's unavailability through misconduct notwithstanding the defendant's belief or, for that matter, the court's belief as to defendant's guilt or innocence of the crimes charged. Dissuading a witness from testifying by threat is sanctionable misconduct irrespective of the nature and perceived veracity of the testimony sought to be prevented. A defendant who seeks to obstruct untruthful testimony is no less guilty of misconduct than one who seeks to obstruct truthful testimony.

## Confrontation Clause and DNA Evidence

Defendant contends that his right of confrontation was also violated when the trial court allowed a prosecution witness to testify regarding DNA testing linking him to the crime scene even though the witness had not personally tested all the items about which she testified.

Preliminarily, insofar as defense counsel never specifically objected to the DNA testimony on the grounds he now presses on appeal, namely that the testimony violated his right of confrontation, defendant failed to preserve this issue for our review (*People v Gray*, 86 NY2d 10, 19 [1995]; *People v Ford*, 69 NY2d 775, 776 [1987]), and we decline to review this issue on appeal in the interest of justice. As an alternative holding, however, we also reject it on the merits.

The Confrontation Clause is implicated anytime a witness offers testimony against the defendant (*Melendez-Diaz*, 557 US at —, 129 S Ct at 2531; *Crawford*, 541 US at 51; *People v Brown*, 13 NY3d 332, 338 [2009]; *People v Rawlins*, 10 NY3d 136, 146 [2008]). Testimony is a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" (*id*. at 146 [internal quotation marks and citation omitted]). Testimony includes depositions, affidavits, and pretrial statements (*id*. at

146-147). The salient issue in determining whether the Confrontation Clause is invoked by the introduction of an out-of-court statement is not whether the statement sought to be used is admissible under the prevailing rules of evidence, but whether the same is testimonial in nature (*Crawford* at 51). Generally, if the statement is testimonial it cannot be used unless the declarant is unavailable at trial and the defendant has had an opportunity to cross-examine the same prior to trial (*id.* at 59; *Melendez-Diaz*, 557 US at —, 129 S Ct at 2531; *Brown* at 338).

■ The admission in evidence of documents evincing the results of laboratory testing performed on narcotics recovered from a criminal defendant, without concomitantly producing those who performed the testing at trial, violates the Confrontation Clause (*Melendez-Diaz*, 557 US at —, 129 S Ct at 2531). Similarly, the admission in evidence of reports evincing the results of fingerprint analysis performed on a defendant's fingerprints and those recovered at the scene of a crime, without producing the person who performed the analysis, both invokes and violates the Confrontation Clause (*Rawlins* at 157). However, the admission in evidence of reports evincing the results of DNA testing performed on DNA samples recovered from a defendant and other sources, without producing the person who performed the analysis, does not violate the Confrontation Clause (*Brown* at 340; *Rawlins* at 158-159; *People v Thompson*, 70 AD3d 866, 866 [2010], *lv denied* 15 NY3d 757 [2010]).

The relevant inquiry is the nature of the out-of-court statement. If the out-of-court statement is testimonial in nature, and seeks to establish facts essential to the elements of the crime, then the Confrontation Clause is invoked (*Melendez-Diaz*, 557 US at —, 129 S Ct at 2532). For example, in *Melendez-Diaz*, the court found that certificates admitted in evidence by the prosecution, evincing the results of tests performed on narcotics seized from the defendant, were akin to affidavits establishing essential elements of the crime for which defendant stood accused (557 US at —, 129 S Ct at 2532). The certificates were deemed equivalent to live testimony seeking to establish that what was seized from defendant was in fact a narcotic (557 US at —, 129 S Ct at 2532). Absent evidence that the analyst who performed the test described in the certificates was unavailable and that defendant had an opportunity to cross-examine the same, admission of the certificates in evidence violated the

Confrontation Clause (557 US at —, 129 S Ct at 2532). In *Rawlins,* the Court of Appeals came to the same conclusion regarding a report establishing that the defendant's fingerprints matched those at several crime scenes (10 NY3d at 157). Noting that the test, on constitutional admissibility, would almost always be fact-specific, the Court stated that the inquiry is "whether a[n out-of-court] statement is properly viewed as a surrogate for accusatory in-court testimony" (*id.* at 151). The Court went on to hold that "[l]atent fingerprint reports—which compare unknown latent prints from the crime with fingerprints from a known individual—fit the classic definition of a 'weaker substitute for live testimony' at trial" (*id.* at 157, quoting *Davis,* 547 US at 828).

With respect to reports describing the results of DNA testing, our courts have reached an altogether different result, noting that testimony regarding such testing is allowed even when the analyst who performed the test is not produced at trial (*Brown* at 340; *Rawlins* at 158-159; *Thompson* at 866). Specifically, in *Rawlins,* a case decided before *Melendez-Diaz,* in *Brown,* and more recently in *Thompson,* it was held that reports evincing the results of DNA testing, when admitted in evidence and testified to, do not invoke the Confrontation Clause and thus can be used against a defendant without production of the analyst who performed the DNA testing (*Rawlins* at 158-159). Typically such reports are not accusatory and merely contain nonidentifying raw data in the form of a DNA profile and thus, standing alone, and in the absence of expert opinion linking the results to the defendant, shed no light on the guilt of the accused (*Brown* at 340; *Rawlins* at 158-159; *Thompson* at 866-867).

Here, at the trial, the prosecution offered testimony from Danielle Coye, a forensic scientist employed by the Office of the Chief Medical Examiner. Coye, testifying from her notes and exhibits in evidence, testified that her office received items from the crime scene, namely clothing, knives, and swabs. With the exception of a pair of jeans, sneakers and socks, she personally performed DNA testing on all other items about which she testified. Several of the items she tested contained DNA matching Johnny, defendant and an unidentified female. The same was true with regard to a pair of defendant's jeans, which Coye did not personally test.

Clearly, with regard to the portion of Coye's testimony that defendant challenges on appeal—that concerning the pair of jeans she did not personally test—the same did not violate his

right of confrontation. The DNA evidence about which Coye testified is the same kind that our courts have found does not violate the Confrontation Clause, namely DNA testing performed by the nontestifying analyst yielding nonaccusatory raw data (*Brown* at 340; *Rawlins* at 158-159; *Thompson* at 866). Thus, the trial court properly allowed Coye's testimony.

Notwithstanding the foregoing, assuming it was in fact error to admit the DNA evidence at issue, given the overwhelming evidence of defendant's guilt, such error was nevertheless harmless.

Defendant contends that the trial court erred in failing to instruct the jury regarding the affirmative defense of extreme emotional disturbance. Insofar as defense counsel never objected to the trial court's failure to submit this instruction to the jury, this issue was abandoned and unpreserved (*People v Dockery*, 272 AD2d 247 [2000], *lv denied* 95 NY2d 934 [2000]), and we decline to review it in the interest of justice. As an alternative holding, we reject it on the merits.

█ We also reject defendant's claim that he was deprived of effective assistance of counsel because his attorney failed to follow up on his initial request for the extreme emotional disturbance instruction. The ineffective assistance of counsel claim is unreviewable on direct appeal (*see People v Love*, 57 NY2d 998 [1982]), because it cannot be determined on the existing record whether counsel's abandonment of the issue was an oversight or a deliberate strategic choice, made on reconsideration of his initial position. Moreover, defendant has not "demonstrate[d] the absence of strategic or other legitimate explanations" for counsel's actions (*People v Rivera*, 71 NY2d 705, 709 [1988]). Counsel could have concluded not only that this defense had little chance of success on this issue, but that placing defendant's mental condition in issue would have opened the door to very damaging evidence, namely that defendant feigned mental illness when he was previously examined under CPL article 730. In any event, an extreme emotional disturbance charge was unwarranted.

We perceive no basis for reducing defendant's sentence.

Accordingly, the judgment of the Supreme Court, Bronx County (Elizabeth A. Foley, J.), rendered December 19, 2007, convicting defendant, after a jury trial, of murder in the second degree, attempted murder in the second degree, and two counts of assault in the first degree, and sentencing him to a term of 20 years to life, consecutive to three concurrent terms of 20 years, should be affirmed.

McGuire, J. (concurring). The principal issue discussed and resolved by the majority is whether the People proved that defendant committed misconduct that caused the unavailability of a witness. That issue is a difficult one if, as I maintain, there is no competent evidence that defendant can be held responsible for a threat allegedly made by an unidentified "friend" of his. My disagreement with the majority is not about how it resolves the issue. I express no opinion on it. Rather, I disagree with the majority about whether we should resolve it at all. At least implicitly, the majority recognizes that it need not resolve it, but does so nonetheless and without explaining why. As discussed below, because we need not resolve the issue, we should not.

At a *Sirois* hearing, "the People must demonstrate by clear and convincing evidence that the defendant, by violence, threats or chicanery, caused a witness's unavailability" (*People v Cotto*, 92 NY2d 68, 75-76 [1998]). If the defendant thus has waived his constitutional right of confrontation, testimonial statements by the witness, such as the grand jury testimony of the witness, are admissible at trial despite the witness's absence. Violence, threats and chicanery are instances of the kinds of misconduct that will support a finding of waiver (*see People v Geraci*, 85 NY2d 359, 366 [1995] ["the principle is often characterized as involving waiver by misconduct" (internal quotation marks and citation omitted)]).

The People rely in part on authorities standing for the proposition that the requisite misconduct can be established by a showing that the defendant exercised a domineering influence over the witness and exploited that relationship to secure the witness's unavailability (*see People v Johnson*, 93 NY2d 254 [1999]; *People v Byrd*, 51 AD3d 267 [2008], *lv denied* 10 NY3d 956 [2008]; *People v Jernigan*, 41 AD3d 331 [2007], *lv denied* 9 NY3d 923 [2007]). But in these cases, either the witness was a child (*Johnson*, 93 NY2d at 257) or the evidence established a history of physical or mental abuse (*Byrd*, 51 AD3d at 273 [summarizing evidence of acts by the defendant and his relatives and noting that "(a)ll this occurred in the context of a relationship with a long history of physical and mental abuse"]; *Jernigan*, 41 AD3d at 332 [concluding that evidence at *Sirois* hearing was sufficient "especially when viewed in a backdrop of (defendant's) several acts of violence going back to the 1980s"]). In this case, Ofelia, the witness, was not a minor, and there was no evidence of a history of abuse. The majority does not address the People's arguments based on these precedents, and I express no

opinion on those arguments. In my view, suffice it to say, those arguments also raise difficult questions that need not be resolved to decide this appeal.

Two witnesses testified at the midtrial *Sirois* hearing, Ofelia's mother and Detective Robert Martin. The detective's testimony added little, if anything, as he testified to not much more than that Ofelia told him prior to trial that she "still loved" defendant, was not going to testify and hoped he "gets out."

Ofelia's mother, Nancy Torres, testified that she never heard defendant threaten her daughter. The court asked her, "[D]id your daughter ever say to you that I have been threatened?" She responded, "Nope." Indeed, she went further and, after stating that defendant had never threatened her, testified in response to another question from the court that defendant "never threatened [Ofelia]." At one point on cross-examination of Ms. Torres, she testified that Ofelia had said that a friend, not friends, of defendant had made such a statement to her. There was no testimony at all identifying this friend, a "person from the street," and no testimony describing the nature of his relationship with defendant. Notably, in its written opinion the trial court made no mention of Ms. Torres's hearsay testimony regarding what Ofelia had said an unidentified person had said; nor did the court make any finding that defendant knew about, condoned or encouraged the alleged threat.

Nonetheless, the majority writes that "Ofelia told Nancy that she would no longer cooperate . . . or testify at trial because defendant, through his friends, told her that if she 'comes in' he would 'get her.'" Similarly, the majority writes both that "defendant engaged in misconduct which induced Ofelia's refusal to testify . . . by threatening her with violence" and that her "refusal to testify was the product of fear, precipitated by defendant's threats." The additional, essentially identical statements the majority makes need not be catalogued. To repeat, there is no credible evidence that defendant knew about, condoned or encouraged the alleged threat.

The only evidence to which the majority can point is Ms. Torres's testimony that "[defendant's] friends from the street were telling her that Sammy keeps saying if she doesn't stay with him, that he was going to hurt her." Even putting aside that on cross-examination Ms. Torres repeatedly stated that her daughter had told her that an alleged friend, not friends, of defendant had made such a statement, this seems too slender a

reed to support the conclusion that the People proved defendant's responsibility for such a threat by clear and convincing evidence. After all, this testimony boils down to an in-court statement by Ms. Torres about an out-of-court statement her daughter assertedly made about an out-of-court statement assertedly made by unidentified persons about an out-of-court statement assertedly made by defendant. Any conclusion that this is competent evidence would be at least a controversial one. On this critical issue, the majority cites no precedent supporting its implicit position that such an extended chain of out-of-court statements originating with out-of-court statements by unidentified persons is not only competent evidence but evidence that can play a decisive role in satisfying the prosecution's burden to prove its case by clear and convincing evidence. To repeat, the trial court did not make any finding that defendant knew about, condoned or encouraged the alleged threat. And, of course, the trial court, not the majority, was able to see Ms. Torres and assess her demeanor. The majority does not explain why it nonetheless believes it appropriate to make such a finding.

The majority incorrectly writes that Ofelia "admitted that she had lied, changing her original story only because defendant so demanded." The majority's sole support for its assertion that Ofelia "admitted that she had lied" is Ms. Torres's testimony that Ofelia had told her that defendant "wants her to say that Johnny did the stabbing and he [defendant] will come out of jail faster." The problem, however, is that the majority simply assumes that the truth is the account Ofelia gave in the grand jury rather than the out-of-court statements that Johnny did the stabbing. There was no evidence at the *Sirois* hearing that substantiates that assumption. As noted, only Ms. Torres and Detective Martin testified, and neither witness gave any testimony, let alone competent testimony, concerning who had done what to whom in the apartment. The majority has nothing to say by way of a response to this point. Ironically, however, the majority writes that "[i]n finding that defendant procured Ofelia's unavailability at trial, it . . . would have been improper[ ] to come to the antecedent conclusion . . . that defendant was guilty of the crimes charged."* Although the majority writes that Ms. Torres "overheard a telephone conversa-

---

* I do not mean to suggest that if there had been clear and convincing evidence at the *Sirois* hearing that defendant was guilty of the crimes charged, it would be impermissible to infer that the evidence established that defendant had induced Ofelia to lie. I note, too, that the People do not contend that the

tion between Ofelia and defendant where Ofelia discussed *tailoring* her testimony to lessen defendant's prison time" (emphasis added), the record does not support this statement. Not only does that loaded verb not appear in Ms. Torres's testimony, nothing in her testimony otherwise provides fair support for the majority's statement. At most, a snippet of her testimony suggests only that Ms. Torres drew the conclusion that Ofelia and defendant were having such a discussion, but Ms. Torres made clear she only heard her daughter's side of certain of the phone conversations. The trial court's written opinion does not mention such a discussion let alone find that it occurred. Again, moreover, the majority is simply assuming that what defendant wanted Ofelia to say was not the truth.

Two final points. First, it is not clear whether the majority believes I disagree with its statement that a "defendant waives his right to confront a witness by procuring the witness's unavailability through misconduct notwithstanding the defendant's belief or . . . the court's belief as to defendant's guilt or innocence of the crimes charged." I agree. Second, the evidence of the number of phone calls defendant made to Ofelia—the number corroborated by telephone records or the vastly greater number to which, according to the majority, Ms. Torres testified—has little or no probative value on the critical question of whether defendant threatened Ofelia or otherwise committed misconduct that induced her not to testify.

In sum, whether the People met their burden of showing that defendant engaged in "misconduct" causing Ofelia's absence is a difficult question I would not decide. We should not decide this question if we need not decide it (*see Matter of Clara C. v William L.*, 96 NY2d 244, 250 [2001] ["We are bound by principles of judicial restraint not to decide constitutional questions unless their disposition is necessary to the appeal" (internal quotation marks and citation omitted)]). On this point, the majority is silent. We need not decide it, and the majority agrees, because the evidence of defendant's guilt is utterly overwhelming without regard to Ofelia's grand jury testimony. Defendant sealed his own fate with the exculpatory (and highly implausible) statement that he first made to the police and, most importantly, the damaging written and videotaped admissions he subsequently made after learning that Ofelia had survived despite the more than 20 stab wounds she had suf-

---

evidence at the *Sirois* hearing includes the evidence received at the trial prior to the hearing.

fered. Those admissions constituted a virtual confession, as defendant admitted getting a knife and being responsible for the wounds inflicted on both victims. In fact, the evidence established that defendant used three knives, two of which were broken, in attacking the victims.

Another key consideration is that in his summation defense counsel raised only the question of defendant's intent. But defendant's attack on the decedent was as savage as his attack on Ofelia. The decedent suffered 15 incised stab wounds and 16 stab wounds. Counsel's summation was just five pages only because he had nothing to say on the issue of intent given the ferocity of the attacks. Accordingly, I would hold that any error in the admission of Ofelia's grand jury testimony was harmless (*People v Crimmins*, 36 NY2d 230, 242 [1975]).

For two reasons, I would not decide the *Crawford* issue defendant raises with respect to one aspect of the testimony given by the forensic biologist, Danielle Coye, called by the prosecution. Without objection, Coye testified, inter alia, that DNA profiles were collected from the evidence, that she determined them to be those of defendant, the decedent and an unknown female, that scrapings from defendant's sweat pants had a mixture of DNA consistent with defendant and an unknown female and that scrapings from defendant's denim jacket were consistent with a mixture of decedent, defendant and the unknown female. After this testimony, Coye was asked if she also examined jeans and sneakers that had been recovered. Coye answered and, after testifying that human blood had been found on the jeans, the prosecutor asked where the blood on the jeans had been found. Defense counsel then objected as follows: "Judge, I must object unless this witness personally examined these items and performed the DNA."

The People reasonably argue that having raised no objection to Coye's testimony regarding her conclusions with respect to DNA results, this sole objection was but a foundational, evidentiary objection. In any event, it is enough to note that to preserve a claim for review, a defendant must make a specific objection that alerts the trial court to the same claim that is pressed on appeal (*see People v Gray*, 86 NY2d 10, 19 [1995]; *People v Ford*, 69 NY2d 775, 776 [1987]). No different rule applies when the appellate claim is couched in constitutional terms (*see People v Rivera*, 33 AD3d 450, 450-451 [2006], *lv denied* 7 NY3d 928 [2006] [failure to specify grounds for objection rendered unpreserved defendant's claims that the evidence

admitted "violated the hearsay rule and the Confrontation Clause"]). As the objection defendant voiced did not alert the trial court to any constitutional claim, especially given the context of the unobjected-to testimony that preceded the objection, it is unpreserved. The objection may have been based on hearsay grounds, but the erroneous admission of hearsay does not establish a violation of the Confrontation Clause. Like the majority, I would not review defendant's current claim in the interest of justice. The second reason I would not decide the *Crawford* issue is that any error in the admission of the testimony that was objected to was harmless for the same reason any error in the admission of Ofelia's grand jury testimony was harmless.

The majority is correct that defendant's claim that the trial court should have charged the defense of extreme emotional disturbance is unpreserved. Like the majority, I would decline to review the claim in the interest of justice, but unlike the majority I would leave it at that, particularly because the record suggests defendant abandoned this claim after the charge conference and never pressed during the conference the arguments he now advances. As for defendant's claim that his trial counsel denied him the effective assistance of counsel by not pressing the initial request for an instruction on extreme emotional disturbance, I agree with the majority that it is not reviewable on direct appeal (*People v Love*, 57 NY2d 998 [1982]). I also agree that there is no basis for reducing the sentence.

ANDRIAS, J.P., and FRIEDMAN, JJ., concur with ROMÁN, J.; CATTERSON and McGUIRE, JJ., concur in a separate opinion by McGUIRE, J.

Judgment, Supreme Court, Bronx County, rendered December 19, 2007, affirmed.