[855 NYS2d 505]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JIMMY BYRD, Appellant.

First Department, April 15, 2008

### APPEARANCES OF COUNSEL

*Daniel Crupain*, New York City, for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Eric Rosen* and *Gina Mignola* of counsel), for respondent.

### OPINION OF THE COURT

MOSKOWITZ, J.

The primary issue on this appeal is whether it was error for the trial judge to admit the complainant's grand jury testimony after determining that the complainant was unavailable to testify at trial because of battered person syndrome. For the reasons that follow, we find no error.

Defendant Jimmy Byrd and Jill J. lived together from late 1991 until defendant's arrest on August 7, 2002. Their daughter was born in January 1993. For years, defendant physically and verbally abused Jill J. On July 26, 2002, defendant flew into a rage apparently because the glass that Jill J. was using for their daughter's water had remnants of juice in it. Defendant smashed Jill J.'s head against the tile floor of their kitchen and, wearing hard plastic sandals, repeatedly stomped on her abdomen, breaking her ribs and causing her pancreas to split in half.

Despite these injuries, defendant refused to take Jill J. to the hospital, responding to one request with a veiled threat that he had not hurt her as much as he could have. Instead, he insisted that she continue performing her usual household chores. He reportedly said that taking her to the hospital would "open Pandora's box."

Over the next few days, Jill J. repeatedly asked defendant to take her to the hospital. Defendant refused. Her condition deteriorated. It was not until six days after the attack, when defendant took their daughter out, that Jill J. was able to go to an emergency room. There, she required surgery to save her life. The surgeon, Dr. Herron, testified that, had she waited longer, she would have died. Defendant was arrested and charged with one count of attempted murder, three counts of first-degree assault and one count of second-degree assault.

At first, Jill J. cooperated with the prosecution. She testified before the grand jury via videotape from the hospital and gave the police physical evidence. Later, however, she stopped cooperating and stated she would refuse to testify at trial.

The court held a *Sirois* hearing (*see Matter of Holtzman v Hellenbrand*, 92 AD2d 405 [1983]) to determine whether to admit Jill J.'s grand jury testimony in the event she would refuse to testify against the defendant at trial. At the hearing, Jill J. maintained that her refusal to testify was a product of her free choice, that she wanted to forgive defendant and that she believed he needed treatment rather than incarceration. She claimed that she cooperated initially and testified before the grand jury out of fear that the Administration for Children's Services would take her child from her.

However, she also admitted reluctantly that she had received "many" calls from defendant since his incarceration. She said that, during these calls, defendant requested money for the prison commissary, told her he loved her, expressed his regret and stated he wanted their family to stay together. Jill J. testified that defendant never asked her not to testify against him. These calls violated an order of protection and, because defendant's prison PIN number would have blocked these calls, defendant likely borrowed PIN numbers from other inmates.

The People presented evidence from several witnesses, including Jill J.'s mother, that Jill J. feared defendant. The People also called Professor Ann Burgess. The court permitted her to testify as an expert in the field of domestic violence and battered person syndrome. Professor Burgess testified that battered victims who go to the police quite frequently recant their initial reports and refuse to continue to cooperate with the prosecution because they become emotionally dependent upon their batterers who have for years controlled them through verbal and physical abuse and isolation from family and friends. Domestic violence has three phases that comprise the "cycle of violence": (1) the tension building phase, (2) the violence phase and (3) the honeymoon phase. During the first two phases the victim is reduced to a state of fear and anxiety due to impending or actual violence. In the honeymoon phase, the abuser acts with contrition, begs for forgiveness and makes declarations of love. During the honeymoon phase, the victim is seduced into believing that the abuse will cease and that the family will remain intact. This cycle repeats itself over many years.

Professor Burgess also testified that during the honeymoon phase, victims of domestic abuse often recant their reports of abuse and refuse to testify. During this phase, the batterer has, often in violation of an order of protection, repeatedly contacted the victim, professing apologies and declarations of love to trick the victim into believing that the violence will end. During this "reconciliation" the batterer is able to convince the victim that recantation would solve their problems. Professor Burgess also noted that the abuser will often use the presence of children in the relationship to pressure the victim to keep the family together. The batterer does not have to tell the victim directly not to testify. Instead, the batterer manipulates the victim and takes advantage of the victim's low self-esteem by talking about how a trial and conviction would hurt the children. All this continues while the victim is legitimately terrified of the bat-

terer and of confronting him in court. Thus, the ambivalence inherent in these relationships, i.e., the control and coercion that the victim believes is love, on the one hand, and terror on the other, work together to deter the victim from ever testifying.

In Professor Burgess's opinion, defendant had "coercive control" over Jill J. The relationship between defendant and Jill J. followed the typical pattern: minor physical abuse escalating into serious physical abuse. Burgess testified that defendant's physical and verbal threats, ridicule and intimidation over the years led Jill J. to fear for her own life and that her daughter could be taken from her.

Professor Burgess described the July 26, 2002 attack as typical of the violence phase because the attack started with an argument over a "trivial incident" (i.e., Jill J.'s failure to clean a glass properly). An assault followed, after which Jill J. returned to cleaning the glass. Her conduct demonstrated defendant's control of Jill J. That defendant inspected Jill J.'s urine and vomit for blood and refused to take her to the hospital, further showed how far defendant controlled her.

According to Professor Burgess, defendant's behavior after Jill J. went to the hospital typified the honeymoon phase. He repeatedly visited her, apologized, begged for forgiveness, told her he loved her and begged her not to break up the family. According to Professor Burgess, defendant, through his loving behavior, was trying to solidify his control over Jill J. Therefore, Professor Burgess believed that the coercion inherent in the "honeymoon phase" caused Jill J. to testify at the *Sirois* hearing that she did not fear defendant. Professor Burgess opined that defendant intended his actions in the honeymoon period to keep Jill J. under his control and prevent her from cooperating in the case against him.

Defendant continued to exert control over Jill J. in that she at first denied receiving more than 400 calls from defendant since his incarceration, testifying instead that she had received only two or three calls. Thus, his continued "coercive control" over her was demonstrated by her willingness to lie under oath to protect him. That defendant called her up to 10 times a day demonstrated the intense pressure he was putting on her. His making these phone calls, despite an order of protection, demonstrated his implicit threat to Jill J., because it showed that he was not going to obey the law. Hence, according to Professor Burgess, defendant had "control" over Jill J. because of his long

history of domestic abuse, his subsequent behavior where he refused to allow her to obtain medical attention and his more than 400 calls to her from prison in violation of an order of protection.

Defendant presented no evidence at the *Sirois* hearing. The court reserved decision on whether to admit Jill J.'s grand jury testimony until trial.

On December 4, 2003, right before trial, Jill J. wrote a personal letter to the court. She wrote that she did not want defendant to remain in jail, but was "confident that if he were given a chance at professional help" he would change. She expressed regret that this was the second holiday season that her daughter had to spend without her father. She also claimed that she was "not expecting to share his life as a wife again." However, Jill J.'s mother, who visited Jill J. right before trial, observed Jill J. wearing a diamond engagement ring that defendant had once given her.

On January 8, 2004, despite a grant of complete transactional immunity with respect to possible perjury arising out of her grand jury testimony, Jill J. refused to testify at trial. The court ruled that Jill J. was unavailable because of defendant's misconduct and admitted her grand jury testimony. Although the court acknowledged the long history of abuse that Jill J. had endured, the court took pains to clarify that the decision was based only on defendant's actions subsequent to the attack on July 26, 2002.

During the trial, the court also permitted Professor Burgess to testify as an expert in traumatic stress and relationship violence. Defendant presented no evidence at the trial. On January 21, 2004, the jury convicted defendant of one count each of first-degree assault and second-degree assault, but acquitted him of the remaining charges of attempted murder in the second degree and two other counts of first-degree assault.

## Discussion

### I. The *Sirois* Hearing and Admission of Complainant's Grand Jury Testimony

The bulk of defendant's claims on appeal focus on the court's decision to admit Jill J.'s grand jury testimony after a *Sirois* hearing. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him" (US Const Sixth Amend). Thus, ordinarily a witness's out-of-court statements, including grand jury testimony, are inadmis-

sible as evidence-in-chief at trial (*see e.g. People v Geraci*, 85 NY2d 359, 365 [1995]).

However, when the People can prove by clear and convincing evidence that a defendant has procured the witness's unavailability "through violence, threats or chicanery," the defendant forfeits the constitutional right to confrontation as well as the protection that the rules against the admission of hearsay would have afforded him or her (*id.* [citations omitted]; *see also People v Jernigan*, 41 AD3d 331 [2007]).

To determine whether to admit a witness's out of court statements, such as grand jury testimony, because a defendant's misconduct has rendered the witness unavailable, courts hold a pretrial hearing, commonly known as a *Sirois* hearing (*Matter of Holtzman v Hellenbrand*, 92 AD2d 405, 415 [1983]). At this hearing, a court must determine whether the People have shown by "clear and convincing evidence" that the witness is "unavailable" to testify at trial and that the defendant, through his or her misconduct, intentionally made the witness unavailable (*Geraci*, 85 NY2d at 366-367; *Jernigan*, 41 AD3d at 332). The People need not demonstrate that the defendant's sole motivation is to procure the witness's unavailability. It is enough that a "desire to silence the witness" motivated the defendant "in part" (*see People v Maher*, 89 NY2d 456, 462 [1997]).

■ The Supreme Court was correct to admit Jill J.'s grand jury testimony at the trial because the People proved by clear and convincing evidence that defendant's misconduct induced her unavailability to testify. After beating Jill J. nearly to death, defendant repeatedly visited her in the hospital, where others observed his hostility and abusiveness. He made hundreds of calls to Jill J. during the pendency of the case in violation of an order of protection. There also were numerous phone calls from defendant's relatives during the pendency of the case and evidence that at least one of those relatives tried to persuade Jill J. not to testify. All this occurred in the context of a relationship with a long history of physical and mental abuse that culminated in the beating that led to this case, in which defendant refused to allow Jill J. to obtain medical attention and threatened her with further abuse were she to seek it.

■ The hearing court also correctly admitted the history of domestic abuse in this case and testimony about battered person syndrome. This evidence was relevant to place defendant's actions in context to show that he had such a degree of control over Jill J. that seemingly innocuous calls or hospital visits

would have a coercive effect on her (*see People v Jernigan*, 41 AD3d at 332 [analyzing defendant's misconduct against the backdrop of his several acts of violence going back 20 years]; *see also People v Santiago*, 2003 NY Slip Op 51034[U], *17 [2003]).

■ Nor was it necessary, as defendant contends, for the court to hold a *Frye* hearing (*Frye v United States*, 293 F 1013 [DC Cir 1923]) before admitting Burgess's expert testimony. A *Frye* hearing is necessary only if expert testimony involves "novel or experimental" matters (*Parker v Crown Equip. Corp.*, 39 AD3d 347, 348 [2007]). Battered person syndrome is not novel or experimental. The courts of this state have accepted it since 1985 (*see e.g. People v Ellis*, 170 Misc 2d 945, 949 [Sup Ct, NY County 1996]).

Using testimony about battered person syndrome at a *Sirois* hearing to show that a defendant has procured a witness's unavailability may be a relatively new application of this theory. However, the application of an accepted theory to a specific factual record does not require a *Frye* hearing (*see Parker v Crown Equip. Corp.*, 39 AD3d 347, 348 [2007]). In sum, it was not error for the court to admit Burgess's expert testimony at the *Sirois* hearing.

■ Defendant also challenges Burgess's trial testimony as unnecessary and irrelevant. However, it is likely that an average juror would not understand the dynamics that cause a battered victim to refuse to testify against her abuser (*see People v Ellis*, 170 Misc 2d at 952-953 [permitting expert testimony about battered person syndrome to explain victim's recantation]). In addition, the court instructed the jury that Burgess was not there to say whether "something is proven or not proven, or something is more likely or not likely in this case, whether something happened or didn't happen." This instruction ensured that the jury did not improperly rely on Professor Burgess's testimony to establish the assault.

Nor does the admission of the portion of Jill J.'s grand jury testimony regarding defendant's preventing Jill J. from seeking medical assistance contravene *People v Maher* (89 NY2d 456 [1997]). The jury in this case, which had to decide if defendant was guilty of attempted murder and first-degree assault, considered only his actions on July 26, 2002, not his actions during the following few days.

II. Is a "Shod Foot" a Dangerous Instrument?

Defendant challenges his conviction under the second count of the indictment (first-degree assault) by contesting only one

element. He claims that a shod foot is not a dangerous instrument because a body part cannot be a dangerous instrument (*see People v Owusu*, 93 NY2d 398, 405 [1999]). This elevates form over substance. A shod foot is clearly a foot "furnished or equipped with a shoe" (Merriam Webster's Collegiate Dictionary 1150 [11th ed 2007]).

Footwear may constitute a dangerous instrument, if, under the circumstances in which a defendant uses it, it is readily capable of causing serious injury (*see e.g. People v Lev,* 33 AD3d 362 [2006] [sneaker was dangerous instrument when used to kick fallen victim in midsection with significant force]; *People v Edwards,* 16 AD3d 226 [2005], *lv denied* 5 NY3d 762 [2005] [shoe was dangerous instrument where kick caused dislocated elbow]).

■ The evidence supported the conclusion that defendant's hard plastic sandal, by virtue of the manner in which defendant used it (i.e., to stomp on Jill J.'s abdomen), was readily capable of causing and did cause serious physical injury. The jury examined the actual sandals defendant used in the attack as well as the shorts Jill J. wore at the time of the attack that still, a year and a half later, bore a footprint. The jury heard Jill J.'s grand jury testimony during which she described how defendant, who was wearing these sandals, repeatedly stomped on her, causing her serious injury. In addition, there was testimony from one of Jill J.'s treating doctors, Dr. Herron, that defendant's footwear could have aggravated her injury. Thus, defendant's "shod foot" was a dangerous instrument.

III. Sufficiency of the Evidence

Defendant points to what he describes as inconsistent testimony from Dr. Herron. After eliciting testimony from Dr. Herron that the victim's injuries were consistent with being stomped on the belly while lying on a hard surface, the prosecutor asked Dr. Herron: "Would it make a difference if the person during the stomping was bare footed or wearing any sort of footwear say hard plastic sandals?" Dr. Herron responded: "It wouldn't make a substantial difference, it would depend how hard the person was kicked." Defendant argues that this answer means only that it was the force with which defendant delivered the blows to Jill J.'s abdomen and not his footwear that caused the serious physical injury. However, this same doctor also testified that defendant's wearing of footwear could have aggravated Jill J.'s injury. Defendant claims that these two statements are inconsistent and therefore the jury could not conclude beyond a

reasonable doubt that defendant's sandal was the proximate cause of Jill J.'s injuries.

"A sufficiency inquiry requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (*People v Danielson*, 9 NY3d 342, 349 [2007]). Here, the jury examined the sandals used in the attack that had an inch-thick piece of hard plastic with raised treads on the bottom. The jury also heard Jill J.'s grand jury testimony that defendant, who was wearing these sandals, repeatedly stomped on her. The jury examined the shorts Jill J. was wearing at the time of the attack with defendant's footprint still visible. Thus, all this evidence, not merely Dr. Herron's testimony, supported the jury's conclusion that defendant had used his shod foot as a dangerous instrument in the assault.

IV. Weight of the Evidence

Nor was the verdict against the weight of the evidence. In conducting a weight of the evidence review, "[e]ssentially, the court sits as a thirteenth juror and decides which facts were proven at trial." (*Danielson*, 9 NY3d at 348.) "[T]he reviewing court must weigh the evidence in light of the elements of the crime as charged to the other jurors" (*id.* at 349). Upon our review of the evidence, we conclude that the jury properly found that defendant had intentionally caused serious physical injury by means of a dangerous instrument.

V. The People's Summation

The court ameliorated any prejudice to defendant from the prosecutor's references to Jill J.'s current fear of him with prompt curative instructions.

Defendant's remaining contentions are unpreserved and we decline to review them in the interest of justice. As an alternative holding, these claims are also rejected on the merits.

Accordingly, the judgment of the Supreme Court, New York County (James A. Yates, J.), rendered February 26, 2004, convicting defendant, after a jury trial, of assault in the first and second degrees, and sentencing him to concurrent terms of 25 years and seven years, respectively, should be affirmed.

LIPPMAN, P.J., SAXE, NARDELLI and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, rendered February 26, 2004, affirmed.