*282 OPINION OF THE COURT
Joseph A. Zayas, J.
Defendant was arrested on November 10, 2010, and charged with various domestic violence offenses, arising from the People’s claims that defendant repeatedly struck his wife, Emutheul Turnquest, and pushed her out of a moving vehicle, causing serious injuries. Defendant was later indicted and charged with attempted murder in the second degree (Penal Law § 125.25 [1]), assault in the first and second degrees (Penal Law § 120.10 [3]; § 120.05 [1]) and reckless endangerment in the first degree (Penal Law § 120.25).
On August 9, 2011, the People moved for an order granting a Sirois hearing (see People v Geraci, 85 NY2d 359 [1995]; Matter of Holtzman v Hellenbrand, 92 AD2d 405 [2d Dept 1983]), arguing that defendant’s misconduct induced the complainant, Ms. Turnquest, to refuse to testify against him. Because of this alleged misconduct, the People contend that defendant effectively forfeited his confrontation rights. As a result, the People seek to introduce into evidence on their direct case several out-of-court statements made by Ms. Turnquest to a civilian witness and various police and medical personnel, as well as personnel from the District Attorney’s Office. Defendant opposes the motion for a Sirois hearing, arguing that the complainant was not “unavailable” because she is in fact available and willing to come to court to testify in the trial of this matter. In support of his claim, defendant submits a sworn affidavit from Ms. Turnquest indicating that in fact she wishes to testify at defendant’s trial. On November 9, 2011, this court granted the People’s motion for a Sirois hearing, which was conducted on November 21, 2011.
Given the complainant’s sworn affidavit and the People’s claims (including the People’s additional claim that the complainant recanted her initial account of the assault), the People’s motion requires the court to determine, inter alia, whether a witness may be deemed “unavailable” for Sirois purposes when the witness is indeed physically available and intent upon testifying at defendant’s trial, albeit to a version of events which completely differs from the version she told to numerous law enforcement officers and medical personnel soon after the alleged crimes.
Because the court finds that the physically available complainant is indeed “unavailable” for the purposes of a Sirois forfeiture of confrontation rights, and because the court otherwise *283 finds that the People have met their burden of showing by clear and convincing evidence that defendant’s misconduct caused the unavailability of the complainant — i.e., the false recantation — the court now grants the People’s motion to introduce into evidence on their direct case various out-of-court statements made by Ms. Turnquest.[1]
The Sirois Hearing
The People’s sole witness at the Sirois hearing was Assistant District Attorney (ADA) Joyce Smith — the ADA initially assigned to this case on November 11, 2010. ADA Smith testified that she first met with Ms. Emutheul (Olive) Turnquest, the complainant in this case, on November 21, 2010, approximately 15 days after the alleged assault occurred. ADA Smith testified that at the time of their first meeting, Ms. Turnquest was wearing a cast on her left hand and appeared to be limping and “still hurting” as a result of the alleged assault. ADA Smith testified that Ms. Turnquest, who had been separated from defendant “for some time,” reported that on November 6, 2010, the defendant appeared at her place of employment and accused her, as he had on prior occasions, of having a sexual relationship with his brother. Ms. Turnquest told ADA Smith that defendant, who smelled of alcohol, pushed her against a wall, took her purse, knocked her glasses off of her face and called her a “slut” in front of her coworkers. Although Ms. Turnquest was afraid to leave with defendant, defendant insisted that she leave with him. Ms. Turnquest eventually acquiesced and they left together.
ADA Smith further testified that Ms. Turnquest reported that during the drive to her home, as she was seated in the front passenger seat and defendant was driving, defendant began punching her in the face, pressing his body against her, and that at one point he grabbed her hand and pulled her finger backwards until the finger broke. While still driving, defendant opened the front passenger door and warned her that if she did not jump from the moving automobile, he would push her. Eventually, defendant did push Ms. Turnquest out of the front passenger side door. Ms. Turnquest told ADA Smith that she was able to see the vehicle’s speedometer and that the vehicle was traveling between 40 and 45 miles per hour when the defendant pushed her out.
*284 Ms. Turnquest told ADA Smith that after defendant pushed her from the vehicle, she was able to flag down a passerby, who called 911 for her. Police and an ambulance arrived soon thereafter and took Ms. Turnquest to North Shore Long Island Jewish Medical Center. ADA Smith testified that Ms. Turnquest signed a supporting deposition, swearing to the truth of the felony complaint, on November 11, 2010.[2]
The court has examined complainant’s medical records from Long Island Jewish Medical Center, which were received in evidence. Although voluminous, one document, entitled “Emergency Department,” contains a handwritten narrative which reads, in pertinent part, as follows: “Assault and thrown from moving vehicle 56 y/o female . . . assault in car by husband. Pt was in an argument w/spouse and he punched her several times and threw her from a moving car 40 mph.” A second document, entitled “Social Worker Evaluation Adult,” reads, in pertinent part, as follows:
“Pt was assaulted, reported this to police on the scene. Pt present w/ difficulty speaking due to injuries to jaw and multiple bodily injuries. Pt was ... in severe pain upon initial assessment. Pt admitted she was beaten in the car by her spouse. Pt would not discuss details, stated she informed police and RN upon admission.”
Seven photographs of Ms. Turnquest were also received in evidence. The photographs, which reflect Ms. Turnquest’s appearance when she was brought to the hospital, demonstrate that Ms. Turnquest’s eyes were bruised and swollen shut, and that Ms. Turnquest’s face was bloodied and had abrasions.
ADA Smith testified that she reviewed a domestic incident report, a complaint form, an arrest report and various other documents prepared by Police Officer Ghani, who rode in the ambulance with Ms. Turnquest, and Detective Justin Hughes, who was the detective later assigned to the case. ADA Smith testified that the account of the incident reflected in the various police reports was consistent with the account that Ms. Turn-quest gave ADA Smith in her office on November 21, 2010.
ADA Smith further testified that defendant made a statement to Detective Hughes at the time of his arrest, in which defendant stated, “I want you to know I never hit my wife before. It was the goddamn Scotch.” ADA Smith testified further that *285 during defendant’s arraignment in Criminal Court on November 10, 2010, and in Supreme Court on March 23, 2011, the court issued an order of protection, directing defendant to stay away from Ms. Turnquest and to have no contact with her directly, electronically, telephonically, or through third parties. ADA Smith testified that on the occasion of their first meeting, Ms. Turnquest was fully cooperative with the prosecution of the case. ADA Smith further testified that she spoke with Ms. Turn-quest again, by telephone, several days after their initial meeting, and that Ms. Turnquest informed ADA Smith that defendant had been released from jail[3] and that he appeared in front of her home twice, which “caused her to be afraid.” When defendant appeared in front of her home, he repeatedly asked her to get into his vehicle so that he could “talk” to her. ADA Smith testified that she advised Ms. Turnquest to immediately call the police and tell them what had occurred, but Ms. Turnquest stated that she was afraid of what the defendant might do if she were to call the police.
ADA Smith subsequently subpoenaed defendant’s phone records, which revealed that nine telephone calls were made from defendant’s telephone to Ms. Turnquest’s telephone from November 28 to November 29, 2010. ADA Smith also subpoenaed additional phone records of defendant which revealed that, despite the extant orders of protection, 348 phone calls were made from defendant’s telephone number to Ms. Turnquest’s telephone number between November 28, 2010 and March 7, 2011. Although ADA Smith admitted that she could not ascertain how many of these calls, if any, resulted in actual conversation between the parties, the subpoenaed records indicate that at least 62 of the aforementioned calls lasted over two minutes in duration and numerous other calls lasted for substantial periods of time (e.g., a 27-minute call on December 26, 2010; a 22-minute call on December 27, 2010; a 17-minute call and a 30-minute call on January 22, 2011; and a 14-minute call on February 24, 2011).
ADA Smith further testified that around the middle of December 2010, when ADA Smith began to try to arrange for Ms. Turnquest to testify in the grand jury — that is, after defendant allegedly showed up twice at Ms. Turnquest’s home and at a time when the subpoenaed records indicate that at least 45 calls had already been made from defendant’s telephone number *286 to Ms. Turnquest’s telephone number — Ms. Turnquest stopped returning ADA Smith’s telephone calls. Ms. Turnquest also failed to comply with two grand jury subpoenas — one in late January 2011 and another in early February 2011.[4]
Nevertheless, ADA Smith was able to arrange a meeting with Ms. Turnquest again at the District Attorney’s Office on April 21, 2011. At this meeting, Ms. Turnquest told ADA Smith that she would not testify against her husband, and that she was not pushed out of a moving vehicle by him. Instead, Ms. Turnquest was now claiming that she jumped out of the vehicle herself while it was not moving. Upon hearing this, ADA Smith showed Ms. Turnquest photographs of her injuries, and asked her “is that what you are telling me, that that’s how you got hurt?” Ms. Turnquest answered “yes.” ADA Smith then asked Ms. Turnquest, “is this what you are going to say under oath if I call you to testify at trial,” and Ms. Turnquest again said, “yes.”
ADA Smith testified that she never asked Ms. Turnquest if defendant (or anyone else) told her to change her account of what happened; nor did ADA Smith specifically ask Ms. Turn-quest why she was changing her account. ADA Smith testified that she spoke with Ms. Turnquest at length on this occasion and she summarized Ms. Turnquest’s position as “she felt she had to tell the truth and this was her truth.” ADA Smith also testified that Ms. Turnquest never said she would “testify falsely” but did say that she would “not come to testify against her husband.”
As a part of her continuing investigation, ADA Smith subpoenaed telephone logs and the recordings of defendant’s telephone calls from the Department of Corrections. Although the telephone records and recordings do not reveal any direct calls from defendant to Ms. Turnquest while defendant was incarcerated, the records and recordings do reveal that there were a number of calls from defendant to various friends and family members, in which defendant directs them to contact Ms. Turnquest in the hopes of getting her to bail him out of jail and to sign a prepared affidavit.
For example, on March 25, 2011 (two days after defendant was placed in custody following his arraignment on the indictment), defendant called his friend and asked him for “Olive’s *287 [Ms. Turnquest’s] phone number,” which the friend provided. Defendant later left a voice mail message for his friend, in which defendant tells the friend to “call [the person whose number the friend provided — Ms. Turnquest] and tell that person that I’ll be calling and to pick up whatever comes over the phone” because “I gotta get in contact with that person.” Several days later defendant again left a voice mail message for his friend in which he says, “call Olive [Ms. Turnquest] and tell her to put the house on bond so I can get the hell out of here.” When defendant finally reached his friend, he asked him if he could arrange “a three way” and the friend replies, “why don’t you call your wife?” Defendant replies, “that’s what I’m trying to do . . . but I can’t do that because she’s got an order of protection.”
In addition, the telephone logs and recordings indicate that on April 8 and 9, 2011, defendant directed his sisters to reach out to Ms. Turnquest to get her to complete an “affidavit” which defendant promised to “mail” and which the attorney would “hook ... up and just throw it to the judge” so that defendant “can get this thing [felony charges] tossed out of there.” The recording also demonstrates that on April 15, 2011, defendant confirmed through his friend that Ms. Turnquest in fact received the “parcel” and directed his friend to “tell [Ms. Turn-quest] to do what was asked of her . . . when she got that parcel . . . just tell her to get the paperwork right. . . . just tell her to get the paperwork ready.”
ADA Smith testified that while she was unaware of any affidavit from Ms. Turnquest at the time she first heard the recordings of these telephone conversations, she later received an unsworn “affidavit” submitted under Ms. Turnquest’s name from defense counsel, and she received an additional, identical copy of a sworn affidavit attached to counsel’s papers opposing the People’s motion for a Sirois hearing. In the sworn affidavit, dated October 20, 2011, Ms. Turnquest alleges that defendant “has never requested that I not cooperate or not come to Court to testify” and “has not in any way coerced, threatened or intimidated me into not coming to Court to testify.” Indeed, Ms. Turnquest alleged that “the opposite is true” because she is “coming to Court to testify at trial as to the events and facts related to the charges against the defendant.”
Discussion
The Confrontation Clause of the Sixth Amendment to the Constitution requires that in all criminal prosecutions a defend *288 ant “shall enjoy the right . . . to . . . confront[ ] . . . the witnesses against him.” Because of this fundamental right, out-of-court statements made by an unavailable witness, such as those sought to be introduced by the People here — statements which Ms. Turnquest made to police, medical personnel, a passerby who called 911 and personnel from the District Attorney’s Office — are generally inadmissible as evidence in chief at trial[5] (see Davis v Washington, 547 US 813, 821 [2006]; Crawford v Washington, 541 US 36, 50 [2004]; People v Cotto, 92 NY2d 68, 77 [1998]; People v Geraci, 85 NY2d 359, 365 [1995]; People v Encarnación, 87 AD3d 81, 86 [1st Dept 2011]).
The right to confront witnesses, however, “is not absolute” (Encarnación at 86) and may be forfeited by a defendant’s misconduct directed at the very unavailable witness whom he now wishes to confront (see Cotto at 76; Geraci at 366; Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415 [2d Dept 1983]). As the United States Supreme Court stated in Davis v Washington (at 833), “one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.” This limited forfeiture-by-misconduct exception to the fundamental right to confront witnesses is “dictated by sound public policy” because the “law will not ‘allow a person to take advantage of his own wrong’ ” (Geraci at 366 [citations omitted]). Further, courts have a paramount duty to protect “the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness” (id. [citation omitted]). In short, the Sixth Amendment right to confrontation “does not require courts to acquiesce” when “defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims” (Davis at 833; see also United States v Mastrangelo, 693 F2d 269, 273 [2d Cir 1982] [forfeiture of confrontation rights required because “(a)ny other result would mock the very system of justice the confrontation clause was designed to protect”]). Accordingly, where the People are able to show, by clear and convincing evidence at a Sirois hearing, that a defendant procured or otherwise caused the unavailability or absence of a witness by his intentional misconduct, defendant will be “precluded from asserting either ‘the constitutional right of confrontation or the evidentiary *289 rules against the admission of hearsay in order to prevent the admission of the witness’s out-of-court declarations’ ” (Cotto at 76, quoting Geraci at 366). Although some of the earlier cases appeared to limit forfeiture to instances where the defendant’s misconduct primarily consisted of “violence, threats or chicanery” (Cotto at 76; Mastrangelo at 272; Matter of Holtzman at 412), it is now clear that forfeiture may also be triggered by various other forms of intentional misconduct on a defendant’s part, including witness intimidation and bribery (Geraci at 369-370), and use of a relationship in which defendant has a “controlling” and “coercive effect” on the witness (People v Byrd, 51 AD3d 267, 273-274 [1st Dept 2008]; see also People v Johnson, 93 NY2d 254, 259 [1999]; Encarnacion at 86; People v Jernigan, 41 AD3d 331 [1st Dept 2007]; People v Smith, 29 Misc 3d 1056, 1058 [Sup Ct, Kings County 2010]).
Although the People bear a “heavy burden of proof’ in demonstrating that defendant’s misconduct caused the witness’s unavailability (People v Steward, 54 AD3d 880, 882 [2d Dept 2008]), “given the inherently surreptitious nature of witness tampering” (Geraci at 369) and given the fact “that a defendant engaging in such conduct will rarely do so openly, resorting instead to subterfuge” (Encarnacion at 87), the People may use “circumstantial evidence ... to ‘establish, in whole or in part, that a witness’s unavailability was procured by the defendant’ ” (Cotto at 76, quoting Geraci at 369). Indeed, often times the People “will be able to rely on nothing more than circumstantial proof and the logical inferences that can be drawn therefrom” (Encarnacion at 87; see also Geraci at 369).
Here, before the court decides whether the People met that heavy burden, the court must address the preliminary question of whether Ms. Turnquest is “unavailable” for the purposes of a Sirois forfeiture of confrontation rights. The defendant maintains that Ms. Turnquest is available and prepared to testify at defendant’s trial — she is neither “silent,” nor “absent.” According to defendant, Ms. Turnquest will testify truthfully and recant her initial false account of the incident. Given the foregoing distinctions, defendant argues that the Sirois forfeiture cases do not apply. The People submit, on the other hand, that the witness is unavailable to them because, aside from ignoring numerous telephone calls and grand jury subpoenas from ADA Smith, Ms. Turnquest flatly told ADA Smith that she would “not come to testify against her husband.” The People further argue that even if Ms. Turnquest were to *290 voluntarily appear and testify at trial, she would testify falsely, which effectively makes her “unavailable” to the People.
The court finds that under the circumstances presented in this case, Ms. Turnquest is clearly “unavailable” to the People. It is true that ordinarily a Sirois forfeiture occurs where the defendant’s misconduct procures or causes a witness’s physical absence (see e.g. People v McCrae, 69 AD3d 759, 760 [2d Dept 2010] [witness murdered]; Jernigan at 332 [witness “failed to appear for trial”]), or a witness’s silence (see e.g. Geraci at 364 [witness left New York State and when returned on material witness order refused to testify]; Encarnacion at 87 [witness “stopped cooperating . . . and was refusing to testify at trial”]; Byrd at 269 [physically available witness refuses to testify]; Holtzman at 410 [same]). There is, however, no good reason to depart from the long-standing Sirois forfeiture-by-misconduct rule simply because the defendant, rather than causing a witness to disappear or fall silent, instead causes the physically available witness to recant her initial accounts of the crime and to offer a completely different version in proposed testimony.
Indeed, the underlying facts in several cases aptly demonstrate that the distinction which defendant attempts to draw amounts to a distinction without a difference. In People v Cotto (92 NY2d at 73), for example, an eyewitness to a shooting began to express reluctance about testifying at defendant Cotto’s trial because he believed his family was in jeopardy. On the morning of the trial, however, the witness promised to tell the truth about what he had seen. When the People later called him to the stand to testify, however, the witness testified that he could not identify the shooter (id.). After a Sirois hearing, the trial court ruled that defendant’s misconduct caused the witness to become “unavailable,” and permitted the People to admit various out-of-court statements made by the eyewitness (in which he identified defendant Cotto as the shooter). Without directly addressing the distinction which defendant attempts to draw here, the Court of Appeals affirmed the finding that the eyewitness was “unavailable” for the purposes of a Sirois forfeiture of confrontation rights, even though the witness, like Ms. Turn-quest here, was physically available and in fact recanted his initial account of the incident in open court.
Likewise, in People v Geraci (85 NY2d at 363), an eyewitness to a shooting testified in the grand jury but later refused to testify at trial. When the witness was later taken into custody on a material witness order, the physically available witness as *291 serted that “he would not repeat the story he told the Grand Jury if he were required to testify at defendant’s trial” (id.). The trial court found that the witness was “practically unavailable,” a finding upheld on appeal by the Court of Appeals, even though the witness was obviously present and prepared to testify to a version of events which differed from his grand jury testimony (id. at 364, 370; see also People v Smith, 29 Misc 3d at 1058 [court held that the People are permitted to use witness’s grand jury testimony on their direct case “in the event (the witness) fails to testify at trial, or her trial testimony is contrary to her grand jury testimony”] [emphasis added]). In short, “unavailability” is not limited to physical unavailability and encompasses a witness’s practical unavailability in the form of silence, or in the form of a witness’s attempt to recant her initial account and offer testimony of a completely different account of the crimes.
Significantly, the public policy goals of the forfeiture-by-misconduct rule — to protect the “integrity of the adversary process” and to prevent a person from “tak[ing] advantage of his own wrong” (Geraci at 366 [citations omitted]) — are just as necessary and essential when a defendant’s misconduct causes a witness to recant her initial accusations and to manufacture a newer version of the “truth.” Misconduct which causes a witness to recant her initial account (and possibly commit perjury), for example, is just as disruptive to the adversarial process as misconduct which causes a witness to disappear or keep quiet. In both cases, forfeiture of the right of confrontation is warranted because “[a]ny other result would mock the very system of justice the confrontation clause was designed to protect” (United States v Mastrangelo at 273).
Further, this broadened definition of “unavailability” in the context of a Sirois forfeiture comports with the definitions of “availability” and “control” in those cases addressing the propriety of giving a missing witness charge. In People v Gonzalez, the Court of Appeals set forth the following rule regarding witness availability and control:
“[I]f a witness, although theoretically ‘available’ to both sides, is favorable to or under the influence of one party and hostile to the other, the witness is said to be in the ‘control’ of the party to whom he is favorably disposed, and an unfavorable inference may be drawn from the failure to call the witness. This conclusion results from the notion that the wit *292 ness’ testimony is, in a ‘pragmatic sense . . . unavailable to the opposing party regardless of physical availability.’ ” (68 NY2d 424, 429 [1986] [citations omitted; emphasis added]; see also People v Hernandez, 256 AD2d 18 [1st Dept 1998], lv denied 93 NY2d 874 [1999] [domestic partner victim who refuses to testify and expresses hostility toward the prosecution is unavailable to, and not in the control of, the People]; People v Congilaro, 159 AD2d 964, 965 [4th Dept 1990] [girlfriend victim unavailable to the People and not in People’s control, where after providing testimony favorable to the People in the grand jury, she “recanted that testimony and provided defense counsel with a statement that exculpated defendant”].)
In short, even in the context of missing-witness charge cases, when a witness, like Ms. Turnquest here, “is favorable to or under the influence of [defendant] and hostile to the” People, the witness is, “in a ‘pragmatic sense,’ ” deemed to be “unavailable . . . regardless of [the witness’s] physical availability” (Gonzalez at 429).
Finally, contrary to defendant’s claims, applying the Sirois forfeiture rule to situations where a witness recants (rather than limiting the rule to situations where the witness disappears or falls silent), would not effectively discourage witnesses from recanting false statements or from otherwise correcting mistakes which such witnesses may have made in their initial accounts of crimes. Indeed, in the court’s view, a Sirois forfeiture would apply in the context of a recantation only when it is the defendant’s misconduct which causes or procures the witness’s recantation. Of course, courts already look upon recantation evidence with skepticism (see e.g. People v Shilitano, 218 NY 161, 170 [1916] [“There is no form of proof so unreliable as recanting testimony”]; People v Lawrence, 247 AD2d 635 [2d Dept 1998] [“It is well settled that ‘(t)here is no form of proof so unreliable as recanting testimony’ ”]; People v Smalls, 70 AD3d 1328, 1330 [4th Dept 2010] [“It is well established that ‘recantation evidence is inherently unreliable’ ”]), and this is especially true where there is evidence that defendant himself may have had a hand in procuring the recantation (People v Wong, 11 AD3d 724, 726 [3d Dept 2004] [courts assessing the reliability of recantation evidence should consider “the relationship between the witness and defendant as related to a motive to lie”]; see also People v Tucker, 40 AD3d *293 1213, 1214-1215 [3d Dept 2007]). In any event, the court is not prospectively ruling that Ms. Turnquest would be precluded from testifying at trial to her different account of the alleged crimes. Nor are the People seeking to preclude Ms. Turnquest from testifying as to that account as a defense witness. As a result, the jury ultimately will decide whether Ms. Turnquest’s initial account of the crimes was true — namely, that defendant beat her and then pushed her out of a moving car — or whether Ms. Turnquest’s recantation is true — namely, that her injuries were caused when she jumped out of a nonmoving car.
In short, as a preliminary matter, the court finds that Ms. Turnquest, although physically available and intent upon testifying at defendant’s trial, is “unavailable” to the People for the purposes of a Sirois forfeiture of confrontation rights. The only remaining question is whether the People have met their burden of showing, by clear and convincing evidence, that defendant’s misconduct caused Ms. Turnquest’s unavailability. Defendant argues that the People have not met that burden because there is no proof as to the content of the telephone calls, and the complainant, in her affidavit, alleged that in fact defendant “has never requested that [she] not cooperate or not come to Court to testify” and “has not in any way coerced, threatened or intimidated [her] into not coming to Court to testify.”
The court finds that the People have met their burden of showing by clear and convincing evidence — the testimony of ADA Smith, which the court fully credits, and the numerous exhibits admitted into evidence — that defendant’s misconduct caused the unavailability of Ms. Turnquest. First, although Ms. Turnquest denies in her affidavit that defendant “in any way coerced, threatened or intimidated [her] into not coming to Court to testify,” Ms. Turnquest does not specifically deny that defendant intimidated her into recanting the initial account of the beating which she provided to various civilian, police and medical witnesses. The absence of that pointed denial in Ms. Turnquest’s affidavit is significant because it is the recantation of Ms. Turnquest’s initial statements — when Ms. Turnquest was not being contacted by defendant — that is the crux of the People’s application in this matter. It is not so much that Ms. Turnquest is refusing to come to court to testify — it is that she is refusing to testify “against” her husband.
Nevertheless, even if Ms. Turnquest had included that pointed denial in her affidavit, the court would not credit it given the *294 mountain of direct and circumstantial evidence which demonstrates that in fact defendant caused Ms. Turnquest to recant her initial accounts. The evidence demonstrates quite convincingly that defendant’s misconduct — his two surprise visits to Ms. Turnquest’s home, his barrage of telephone calls to Ms. Turnquest, and his use of various third parties to contact Ms. Turnquest, all in violation of the extant orders of protection— caused the once completely cooperative complainant to become unavailable.
Defendant’s witness tampering campaign commenced when he twice showed up at Ms. Turnquest’s home and asked (or directed) her to get in his car. These unannounced visits, which occurred almost immediately after defendant was released from jail, caused Ms. Turnquest to be “afraid.” Ms. Turnquest’s fear, of course, was reasonable because the last time Ms. Turnquest entered defendant’s car, defendant allegedly brutally attacked her, pushing her out of the moving car. Ms. Turnquest’s fear was also reasonable because defendant’s two surprise visits vividly demonstrated to Ms. Turnquest that defendant was intent upon thumbing his nose at judicial authority and the criminal justice system, given that the visits occurred immediately after the court’s issuance of an order of protection which specifically directed defendant to “stay away” from Ms. Turnquest’s home (see e.g. People v Byrd, 51 AD3d at 271 [according to expert in battered person syndrome, defendant’s numerous telephone calls to the domestic violence complainant, “despite an order of protection, demonstrated his implicit threat to [the complainant], because it showed that he was not going to obey the law”]; People v Smith, 29 Misc 3d at 1058 [“(o)rders of protection are . . . issued by courts as much to prevent assaults on the psyche of a vulnerable victim as to prevent assaults on her person”]). Indeed, Ms. Turnquest was not only, “afraid” to enter defendant’s car, she was afraid to report the alleged violations of the order of protection because she feared what defendant would do to her.
Having sowed the seeds of fear in Ms. Turnquest by twice going to Ms. Turnquest’s home in violation of the extant order of protection, defendant then commenced an aggressive telephone campaign, calling her approximately 348 times between November 28, 2010 and March 7, 2011. Although defendant is correct that the People failed to prove the content of these calls or, for that matter, that any actual conversation occurred during those calls which would indicate that defendant was attempting *295 to influence Ms. Turnquest to recant her initial accounts of the crimes, the absence of that proof is not fatal to the People’s motion (see People v Jernigan, 41 AD3d at 332 [defendant forfeited confrontation rights by misconduct which included, inter alia, “59 calls to (the complainant) whose content could not be determined”]). In attempting to prove acts of witness tampering, the People often times “will be able to rely on nothing more than circumstantial proof and the logical inferences that can be drawn therefrom” (Encarnacion at 87), “given the inherently surreptitious nature of witness tampering” (Geraci at 369) and given the fact “that a defendant engaging in such conduct will rarely do so openly, resorting instead to subterfuge” (Encarnacion at 87).
Here, the sheer number of calls alone, even in the absence of proof of actual conversation, sends a loud and clear ominous message to Ms. Turnquest, given that each individual call constituted an attempt to violate the extant order of protection. Furthermore, contrary to defendant’s claims, the only fair inference to be drawn from the subpoenaed telephone records is that actual conversation occurred during many of the calls. First, common sense dictates that conversation is generally the reason that one person calls another; telephone calls are generally not made so that the parties can listen to each other’s silence. Second, the subpoenaed records in this case indicate that at least 62 of the aforementioned calls lasted over two minutes in duration and numerous other calls lasted for substantial periods of time (e.g., a 27-minute call on December 26, 2010; a 22-minute call on December 27, 2010; a 17-minute call and a 30-minute call on January 22, 2011; and a 14-minute call on February 24, 2011). Again, the only fair inference to be drawn from these extended calls is that defendant was talking to Ms. Turn-quest in violation of the order of protection.
Moreover, inasmuch as Ms. Turnquest’s reluctance to cooperate with the prosecution of the case began to occur at precisely the time that she receives a barrage of telephone calls from defendant, it is manifest to the court that by the calls, as well as his surprise visits, defendant intended to, and in fact did, use the telephone calls and his relationship with her to cause Ms. Turnquest to stop cooperating with the prosecution and to ultimately recant her initial accounts of the crimes (see e.g. Byrd at 273 [defendant forfeited confrontation rights by misconduct which included, inter alia, “visits” and “hundreds of calls to (domestic violence complainant) during the pendency *296 of the case in violation of an order of protection”]; Jernigan at 332 [“defendant wrongfully made use of his relationship with the victim in order to pressure her to violate her duty to testify” by, inter alia, making 59 telephone calls to the complainant and leaving her a voice mail imploring her not to send him to prison]).
Indeed, defendant’s intent to cause Ms. Turnquest to stop cooperating with the prosecution is likewise manifested in his numerous recorded telephone calls to various third parties — the contents of which were received in evidence. The unmistakable import of these recorded telephone calls is that defendant was attempting to use these third parties to get Ms. Turnquest to prepare a document or “affidavit” which defendant intended to then submit to the “judge” to get the charges “tossed” out. Aside from the fact that these calls also represented violations of the extant order of protection, the fair and logical inference to be drawn from the contents of these calls is that defendant was attempting to influence Ms. Turnquest to help him in one way or another to get the charges dismissed, for charges get “tossed” out when witnesses stop cooperating with the prosecution or when the incriminating statements which formed the very basis for the charges are recanted. Notably, the timing of these third-party calls, like the timing of the previous 348 calls, is important because Ms. Turnquest informed ADA Smith that she would not testify “against” her husband and would recant her initial account of the crime on April 21, 2011 — that is, only one week after defendant confirmed that Ms. Turnquest had received the affidavit (referred to as “that parcel”) and only two weeks after defendant enlisted the help of these third parties to contact Ms. Turnquest.
Given the aforementioned direct and circumstantial evidence, the court finds that the People have met their burden of establishing by clear and convincing evidence that defendant’s misconduct caused Ms. Turnquest to become unavailable and to recant her initial account of the crimes. As a result, at the trial of this matter defendant will be “precluded from asserting either ‘the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of [Ms. Turnquest’s] out-of-court declarations’ ” (Cotto at 76, quoting Geraci at 366). Accordingly, the People’s motion to introduce into evidence on their direct case various out-of-court statements made by Ms. Turnquest is hereby granted.

. The court issued a short order granting the People’s motion on January 12, 2012. This decision sets forth the court’s findings of fact and conclusions of law.

. The felony complaint referenced in the supporting deposition essentially reflects the content of Ms. Turnquest’s statements to ADA Smith.

. A bail receipt in the court file indicates that defendant was released on bail on November 24, 2010.

. On March 7, 2011, ADA Smith presented the case to the grand jury without Ms. Turnquest’s testimony. Defendant was arraigned on the indictment in Supreme Court on March 23, 2011, and new bail, in the amount of $75,000, was set, resulting in defendant being placed in custody.

. The court renders no opinion regarding the admissibility of the proffered out-of-court statements pursuant to the nontestimonial excited utterance exception (People v Nieves-Andino, 9 NY3d 12 [2007]) and the medical records exception (People v Ortega, 15 NY3d 610 [2010]) to the hearsay rule.