OPINION OF THE COURT
Elisa S. Koenderman, J.
On October 5, 2012, the court denied the People’s application for forfeiture of the defendant’s constitutional right to confrontation and admission of the complainant’s prior statements to law enforcement against him at trial. After a Sirois hearing[1] held on August 23, 2012 and August 30, 2012, the court found that the People failed to show by “clear and convincing” evidence that the defendant procured the complainant’s “unavailability” through misconduct. The following decision explains the basis for the court’s ruling.
The Facts
Police Officer Michael Torres testified that at about 2:00 p.m. on July 23, 2011, he received a radio run of an assault in progress at 84-70 129th Street in Queens County. When he responded, the defendant and the complainant, Ara Ismat, were both present. Ismat had a bloody lip and blood on her cheek. She told Officer Torres that she had gotten into a verbal altercation with the defendant, her husband, which escalated to the point where he smacked her in the face. Officer Torres asked Is-mat to fill out a domestic incident report (DIR). Ismat wrote a statement under the supporting deposition attached to the DIR and signed it in the officer’s presence.[2] Officer Torres subsequently drafted a misdemeanor complaint, which he provided to Ismat. After reading it, she signed a supporting deposition[3] for the misdemeanor complaint, again in his presence. Officer
*556 Torres testified that when he interacted with Ismat, she was cooperative with the prosecution.
Assistant District Attorney (ADA) Deanna Paul testified that on October 26, 2011, she and ADA Gloria Lam (also known as Gloria Pellegrino)[4] met with Ismat in the Family Justice Center at the Queens District Attorney’s Office. During that meeting, Ismat told ADA Paul that she did not want to testify against the defendant and that she wanted to drop the charges against him. Ismat stated that she believed the incident “was an accident” and “that [the defendant] hadn’t intended to hurt her.” When ADA Paul confronted Ismat with the DIR, the supporting deposition for the misdemeanor complaint, and photographs of Is-mat’s alleged injuries, Ismat did not respond. ADA Paul never asked Ismat whether the defendant had forced or intimidated her not to testify. ADA Paul was aware that on September 28, 2011, Ismat had spoken to ADA Pellegrino and told her that she was financially dependent upon the defendant and that she had “changed her mind” and wanted a limited order of protection against him.[5]
At the October 26, 2011 meeting, Ismat gave ADA Paul her cell phone number, which matched the phone number she previously provided in the DIR. After that date, however, Ismat failed to respond to ADA Paul’s numerous attempts to telephone and subpoena her. ADA Paul next obtained the defendant’s cell phone number from the arrest and Criminal Justice Agency reports on file.[6] She then subpoenaed the defendant’s cell phone records, including both incoming and outgoing calls for the billing period between June 23, 2011 and April 25, 2012.[7] ADA Paul testified that the records showed that between July 24, *557 2011 and September 13, 2011, approximately 50 calls were made from the defendant’s cell phone to Ismat’s cell phone. These calls were approximately one minute in duration. Between September 14, 2011 and September 28, 2011, many additional calls were made from the defendant’s cell phone to Ismat’s cell phone. The duration of these calls was longer, in some instances between 5 and 10 minutes. Between September 28, 2011 and the October 26, 2011 meeting between Ismat and ADA Paul, approximately 40 calls were made from the defendant’s cell phone to Ismat’s cell phone. In total, from July 24, 2011 to October 26, 2011, approximately 120 calls were made from the defendant’s cell phone to Ismat’s cell phone, approximately 30 of which lasted longer than two minutes.[8]
ADA Paul acknowledged that none of the phone calls were recorded and that she did not know the contents of any of the phone calls, or even whether the defendant might have called Ismat’s cell phone to speak to his stepson or daughter, both of whom live with Ismat. ADA Paul also admitted that she had never asked Ismat whether the defendant was calling her.
On March 15, 2012, ADA Paul again met with Ismat, who was accompanied by an attorney. At that meeting Ismat stated that she was concerned that the defendant would be deported to Bangladesh if the criminal case continued and that the case needed to be dropped because the defendant could not accept any plea offer. She was “absolutely not” cooperative with the prosecution at that time.
ADA Gloria Pellegrino testified that she spoke with Ismat between July 24, 2011 and September 13, 2011. ADA Pellegrino asked Ismat about the alleged incident as well as for background information. Ismat informed ADA Pellegrino that she had been in a relationship with the defendant for five years and that she had one child in common with him in addition to a child from a previous relationship. Ismat also told ADA Pellegrino that she worked part time as a home health aide. When ADA Pellegrino asked Ismat about the history of abuse between them, Ismat said that the defendant had hit her before but she “didn’t want to go back and speak about the past incidents.” After ADA Pellegrino explained the difference between a full and limited order of protection, Ismat stated that she wanted a full order of protection against the defendant but that she “possibly . . . could go *558 down to a limited order as the case progressed” and that she had to “talk to [ADA Pellegrino] more about it.” Ismat was “very cooperative” with the prosecution during this time period.
When ADA Pellegrino spoke with Ismat again on September 13, 2011, Ismat was “pretty adamant” that she wanted a “full, complete” order of protection because she “no longer want[ed] anything to do with the defendant.” Thereafter, on September 28, 2011, Ismat informed ADA Pellegrino that she now wanted a limited order of protection because the defendant was “talking to her” and she was “concerned about his job.” On October 26, 2011, the case was calendared for a hearing and Ismat came to the District Attorney’s Office. Ismat then stated for the first time that the defendant had not punched her, but had only hit her, and that she believed it was an accident. Ismat never told ADA Pellegrino that she was afraid of the defendant or that he was preventing her from cooperating with the prosecution.
Analysis
Once the People demonstrate a “distinct possibility” that the defendant’s misconduct has procured the “unavailability” of a witness, they are entitled to a hearing to determine whether the defendant has forfeited his constitutional right to confrontation by wrongdoing (see People v Cotto, 92 NY2d 68, 72 [1998]; Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415 [2d Dept 1983]). Where the People prove, by “clear and convincing” evidence, that the defendant engaged in violence, threats or chicanery which caused a witness’s unavailability, “the defendant may not assert either the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness’s out-of-court declarations” (People v Geraci, 85 NY2d 359, 365-366 [1995] [citations omitted]; Cotto, 92 NY2d at 75; People v Johnson, 93 NY2d 254, 258 [1999]). “Unavailability” encompasses more than mere physical absence of a witness; a witness is unavailable when she refuses to testify against the defendant (see Cotto, 92 NY2d at 73; Geraci, 85 NY2d at 364) or when she recants prior statements inculpating the defendant (see People v Congilaro, 159 AD2d 964, 965 [4th Dept 1990]; People v Turnquest, 35 Misc 3d 329, 339 [Sup Ct, Queens County 2012]). Because a defendant engaging in witness tampering will often resort to subterfuge, the People may use circumstantial evidence to establish that the witness’s unavailability was procured by the defendant’s *559 misconduct (see Cotto, 92 NY2d at 76). Forfeiture of the right to confrontation under these circumstances is justified by the maxim that the law will not “allow a person to take advantage of his own wrong” and by the sound public policy of protecting the integrity of the adversary process by reducing the incentive to tamper with witnesses (see Geraci, 85 NY2d at 366-368 [citations omitted]). Where a defendant has forfeited his right to confrontation by misconduct, any sufficiently reliable prior statement of the witness is admissible as direct evidence against the defendant (see Cotto, 92 NY2d at 77-78).
In addition to violence, threats and chicanery, misconduct by the defendant which procures a witness’s unavailability includes wrongfully using his relationship with the witness to pressure her not to testify (see People v Jernigan, 41 AD3d 331 [1st Dept 2007]). For example, a defendant with a history of violence who brutally and repeatedly slashed his former girlfriend with a razor subsequently caused her unavailability as a witness by leaving messages on her answering machine urging her not to send him to prison and imploring her not to testify (id.). Under these circumstances, the fact that the victim visited the defendant in jail while the case was pending revealed “the defendant’s obvious ability to control [her]” (id. at 333). Similarly, a defendant with a long history of physically and mentally abusing his girlfriend, who stomped on her abdomen, breaking her ribs and severing her pancreas, later caused her unavailability as a witness by visiting her in the hospital and calling her hundreds of times in violation of an order of protection to tell her that he loved her, was sorry, and wanted their family to stay together (People v Byrd, 51 AD3d 267, 273 [1st Dept 2008]). Whatever else he intended, it was enough that the defendant’s actions were motivated “in part” “by a desire to silence the witness” (Byrd, 51 AD3d at 273, citing People v Maher, 89 NY2d 456, 462 [1997]). The history of abuse by the defendant against the victim, viewed in context with expert testimony about “battered person syndrome,”[9] illustrated the defendant’s degree of control over the victim (id. at 273-274). Although the defendant never asked the victim not to testify, his “seemingly innocuous” actions of visiting her and calling her had a “coercive effect” upon her (id.). Lastly, a defendant who seriously injured his wife by *560 shoving her from a moving vehicle thereafter caused her recantation and unavailability as a witness by visiting her, calling her hundreds of times and using third parties to contact her, all in violation of an order of protection (Turnquest, 35 Misc 3d at 342). Although there was no evidence that the defendant had abused her previously, the victim admitted to the prosecution that she became afraid when the defendant appeared at her home after being released from jail (id. at 333). Therefore, despite the victim’s willingness to testify for the defense, the defendant’s misconduct rendered her unavailable as a witness for the People (id. at 338). In all three of the above-referenced cases, the defendant procured the victim’s unavailability by using coercive control to manipulate her love and fear of him (Byrd, 51 AD3d at 270-271; Jernigan, 41 AD3d at 332; Turn-quest, 35 Mise 3d at 330-331). Consequently, each defendant forfeited the right to confront the victim at trial (Byrd, 51 AD3d at 273-274; Jernigan, 41 AD3d at 333-334; Turnquest, 35 Misc 3d at 342-343).
Here, the People contend that the defendant likewise used his coercive control over Ismat to procure her unavailability as a witness. The People assert that Ismat’s recantation and refusal to testify coincide with numerous phone calls allegedly made by the defendant to Ismat in violation of an order of protection. They claim that the timing of the phone calls, together with Is-mat’s admission that she talked to the defendant, her expressed concerns about the defendant’s job and potential deportation to Bangladesh as well as her financial dependency on him, prove that the defendant wrongfully used his relationship with Ismat to induce her to recant and refuse to testify. In support of their argument, they primarily cite to Byrd, Jernigan and Turnquest. In this case, however, the circumstantial evidence does not satisfy the People’s “heavy burden of proof’ that the defendant’s misconduct caused Ismat’s unavailability as a witness (People v Steward, 54 AD3d 880, 882 [2d Dept 2008]).
Contrary to the cases upon which the People rely, there is no clear and convincing evidence that the defendant procured Is-mat’s unavailability by using coercive control to manipulate her love and fear of him (compare Byrd, 51 AD3d at 270-271). In Byrd, the People established that there was a long history of abuse by the defendant against the victim and proffered expert testimony on battered person syndrome to explain how that history rendered the victim unwilling to testify (id. at 273-274). In Jernigan, the relationship between the defendant and the *561 victim, including his past acts of violence against her, was “fully explored” (Jernigan, 41 AD3d at 333). In both Byrd and Turn-quest, the People also proved that the defendant used family and friends to pressure the victim not to testify (Byrd, 51 AD3d at 273; Turnquest, 35 Misc 3d at 334). In all three cases, there was ample evidence to support the conclusion that the defendant had coercive control over the victim. Here, although the People presented testimony that the defendant and Ismat were intimate partners for five years with a child in common and that Ismat told the prosecution that the defendant had hit her before, they failed to elicit any additional evidence describing the nature of the defendant’s relationship with Ismat or the history of abuse between them. Indeed, ADA Pellegrino testified that Ismat would not discuss the alleged past incidents of abuse. Moreover, the People proffered neither expert testimony to explain Ismat’s recantation and refusal to testify nor evidence of third-party influence upon her behavior. Thus, the record yields little support for the finding that the defendant had coercive control over Ismat.
Further, in stark contrast to Byrd, Jernigan and Turnquest, the defendant is not accused of committing a life-threatening act against Ismat. Indeed, the defendants in the other three cases all were convicted of serious felonies, whereas here the defendant is charged only with a misdemeanor. In Byrd, the defendant stomped on the victim’s abdomen and severed her pancreas; in Jernigan, the defendant brutally and repeatedly slashed the victim with a razor; and in Turnquest, the defendant shoved the victim from a moving vehicle. Each of these heinous acts in and of itself provides an objective and compelling reason for the victim to fear the defendant. In this case, the defendant allegedly punched Ismat. While not trivial, a punch does not compare in either magnitude or gravity to stomping, slashing or shoving a victim from a moving vehicle. While logic dictates that the victim of a stomping, slashing or a shove from a motor vehicle must fear her assailant, a victim of a punch may or may not fear him. Moreover, whether the victim of a punch fears her assailant may depend upon the circumstances of the attack, including the nature and extent of any injury she suffered[10] as well as the nature and history of her relationship with her assailant, including whether and under what circum *562 stances he has attacked her before. Apart from the bare assertion that the defendant had hit Ismat before, no such evidence was elicited here. It is not fair to presume, therefore, that Ismat must fear the defendant from the mere allegation that he punched her. Moreover, to assume that Ismat must fear the defendant because he purportedly hit her previously is speculative given the aforementioned lack of evidence. Finally, unlike Turn-quest, Ismat never told the prosecution she was afraid of the defendant. Thus, the record is too weak to support the finding that Ismat is afraid of the defendant.
Finally, although the People introduced phone records indicating that over 100 calls were made from the defendant’s cell phone to Ismat’s cell phone during a three-month period while a full order of protection was in effect, the calls were not recorded and their contents are unknown. Even assuming arguendo that the records circumstantially establish that the defendant was calling Ismat in violation of the order of protection, without evidence of the contents of the calls there is no basis to conclude that the defendant’s actions caused Ismat to recant and refuse to testify. Notably, nearly half of the calls were made between July 24, 2011 (the defendant’s arrest date) and September 13, 2011 (when Ismat first met with the prosecution), the period in which ADA Pellegrino described Ismat as “very cooperative” with the prosecution. Although the calls between September 14, 2011 and September 28, 2011 (when Is-mat stated she wanted a limited order of protection) lasted longer than before, fewer calls were made between September 28, 2011 and October 26, 2011 (when Ismat recanted her original allegations). Moreover, because the phone records do not extend beyond October 26, 2011, there is no proof that the defendant called Ismat between that date and March 15, 2012 (when Is-mat appeared with an attorney and refused to testify).[11]
Accordingly, the evidence adduced fails to demonstrate that Ismat’s recantation and refusal to testify are motivated by anything other than her concerns about the defendant’s job and possible deportation. Indeed, the fact that Ismat expressed her position to the People through an attorney retained and ethically bound to represent her interests bolsters the conclusion that Ismat’s actions are voluntary. Since the People did not es *563 tablish the defendant’s coercive control over Ismat or Ismat’s fear of him, they have failed to meet their burden of proof by clear and convincing evidence that the defendant caused Is-mat’s unavailability as a witness by calling her in violation of the order of protection. The People’s application for forfeiture of the defendant’s right to confrontation and admission of Is-mat’s prior statements as direct evidence against him at trial therefore is denied.

. The People moved in writing for the hearing on May 30, 2012, contending that a “distinct possibility” existed that the defendant engaged in misconduct which caused the complainant to become unavailable as a witness. The defendant orally consented to the hearing on the record on July 18, 2012.

. The DIR was admitted into evidence as People’s exhibit 2. The “Supporting Deposition” of the DIR is signed by Ismat under penalty of perjury and witnessed by Officer Torres. It states “I had an argument with my husban [sic]. After he punch and hit me. It not first time he hit me. Couple of time he hit me.”

. The misdemeanor complaint and accompanying supporting deposition were admitted into evidence as People’s exhibit 3. The misdemeanor complaint alleges that “the defendant punched [Ismat] multiple times about the face and pulled on her hair, causing a laceration to her lips.” The accompanying *556 supporting deposition, which is signed by Ismat under penalty of perjury, states that “the facts stated in the [misdemeanor complaint] to be on information furnished by me are true upon my personal knowledge.”

. ADA Pellegrino was the assistant originally assigned to prosecute the instant case.

. ADA Paul additionally testified that after the defendant was arrested on July 23, 2011, a full order of protection was issued against him on Ismat’s behalf, which was in effect on October 26, 2011. The order of protection directed the defendant to stay completely away from Ismat and not to communicate with her by any means, including by telephone. The order of protection was admitted into evidence as People’s exhibit 4.

. The defendant’s and Ismat’s cell phone numbers are the same except for the final digit: the defendant’s number ends in “0” while Ismat’s ends in

. The T-Mobile cell phone records were admitted into evidence as People’s exhibit 5.

. The telephone records reflect that a number of phone calls were made from Ismat’s cell phone to the defendant’s cell phone during this time period as well.

. The expert testimony about “battered person syndrome” explained the three phases of the “cycle of violence” — “tension building,” “violence,” and “honeymoon” — and their effect upon the willingness of a victim of domestic abuse to testify against her batterer (Byrd, 51 AD3d at 270, 273).

. Although ADA Pellegrino testified that when Ismat recanted her allegations she confronted her with photographs of her injuries, the People did not offer those photographs into evidence.

. Nevertheless, had the People demonstrated that the defendant had coercive control over Ismat or that she was afraid of him, the contents of the calls might have been superfluous given their volume and timing (cf. Turn-quest, 35 Misc 3d at 343).