**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 50857**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: April 24, 2025** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) |
| RYAN MATTHEW SAMFORD, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Steven J. Hippler, District Judge.

Judgment of conviction for attempted strangulation and felony domestic violence or battery, <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender; Kiley A. Heffner, Deputy Appellate Public Defender, Boise, for appellant. Kiley A. Heffner argued.

Hon. Raúl R. Labrador, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.
_____

LORELLO, Judge

Ryan Matthew Samford appeals from his judgment of conviction for attempted strangulation and felony domestic violence or battery. We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Deputies responded to a report of a domestic dispute at a home. The caller reported that his female roommate, J.T., came into his bedroom and told him her boyfriend, Samford, tried to choke and kill her. The roommate stated that J.T. was in the roommate's truck outside and that she had marks on her neck. When the deputies arrived, they spoke with J.T. and noted she was extremely upset while recounting the events of the night. When asked what happened, J.T. broke

1

down and responded with something to the effect of "I'm still in love with that guy--the guy who tried to kill me."

J.T. told the deputies that she and Samford had been at a party earlier that night and returned home to their shared residence where they had a verbal altercation. J.T. could not recall the subject of the argument but stated that she remembered that Samford took her to the floor between the bed and desk in their bedroom. She stated Samford then held her down on her back by the neck with his hand or hands and she unsuccessfully tried to call out and have the Siri feature call 911. J.T. stated she was eventually able to push Samford off, punched him in the face, and ran to her roommate's room.

One of the deputies observed a red, semi-circular mark on the left rear of J.T.'s neck. The fire department also responded to evaluate J.T. and observed red marks on the front and back of her neck. The primary emergency medical technician noted in his report that J.T. had "red and inflamed marks on her neck," as well as "subconjunctival hemorrhage in her eyes from being choked for so long."

When interviewed by deputies, Samford initially denied that any physical altercation took place. When confronted with J.T.'s statements, Samford stated J.T. was "very excitable" and that he had been forced to get her off of him. When asked to further describe the physical fight, Samford stated, "it was more of a grapple." When questioned about a visible scratch on his arm, Samford stated that J.T. was kicking and flailing during the incident. Samford could not provide an explanation when asked why J.T. would have been kicking and flailing. Samford was subsequently arrested for attempted strangulation.

After being booked at the jail, Samford immediately began to make phone calls to J.T. During the first call, J.T. asked Samford why he strangled her and told him that he almost killed her. Samford apologized and told J.T. he loved her and did not want to hurt her. In a second phone call, J.T. again asked Samford why he strangled her, and he replied, "I can't remember why, I overreacted." Later in the call, Samford told J.T., "I don't know what's going to happen. Apparently, I'm supposed to have court tomorrow. Honestly, if I could, I would spend the rest of my life making up for it." J.T. responded: "You're not going to get that chance now [Samford]--I literally thought I was going to die." Toward the end of the call, Samford again told J.T. he loved her and apologized.

2

After reviewing Samford's calls with J.T., a deputy interviewed Samford. During the interview, Samford agreed with the deputy that Samford's comments could be perceived as him trying to influence, deter, or impede J.T. from potentially testifying truthfully in the upcoming criminal proceedings.

Relevant to this appeal, J.T. had a follow-up phone call with another detective the day following the altercation. J.T. disclosed the following:

> I have no idea how it started. All I know is that all of a sudden he was on top of me, I was on my back, his hands were around my throat and I was screaming but all that would come out was really hoarse little whisper of screaming "Hey Siri, call 911" as hard as I could because I didn't know where my phone was. . . . I knew I was going to die, I was terrified, just screaming. . . . I was super aware that it was only like a hoarse whisper and it was even scarier when I screamed but then I tried to breathe in again so I could scream again but I couldn't breathe in again to scream again. . . . Three times I got gasps of breath and I keep thinking he choked me three times, but it was all at once. I was just kicking and kicking. . . . I know that the only way I was able to get him off me, even a little bit, was if I kicked my legs up behind over his shoulders a little bit towards the front because I was laying on my back and he was straddling me. . . . I used all of my strength and . . . at some point, somehow I was able to get away.

J.T. explained that she ran to her roommate's bedroom naked and hysterical. The roommate gave J.T. some clothes, and the two of them exited the residence and got into the roommate's truck. The roommate called the police while J.T. contacted her parents. During the interview, the detective asked J.T. how she was feeling, and she responded:

> My throat is still sore, I'm not having trouble swallowing anymore. For a while it was hurting a lot to swallow. My muscles are so sore, it feels like I did a bunch of bench presses. My chest muscles are really sore. . . . My core is sore like I did a bunch of crunches. . . . I am covered in bruises. I can see where his fingers and thumbs were on my arms because I know at some point he held my arms down.

Three days later, J.T. went to the hospital to be evaluated for continuing neck pain and symptoms. Also relevant to this appeal, a nurse recorded the following in J.T.'s medical records:

> Patient states alleged physical abuse on Saturday at her house with her and her significant other. Patient states boyfriend tried to 'strangle her', no obvious bruising noted today, patient c/o lateral neck pain and trouble swallowing. This RN noticed bruising on left forearm and small abrasion on right forearm. Patient denies abdominal or lower extremity trauma.

The treating physician diagnosed J.T. as suffering from strain of her neck muscle and odynophagia (painful swallowing).

A no-contact order was issued that prohibited any contact between J.T. and Samford; however, J.T. filed a motion to terminate the no-contact order shortly thereafter. The magistrate court modified the no-contact order to allow written and electronic communication between J.T. and Samford while he was in custody, with a specific provision prohibiting them from discussing the case.

J.T. and Samford began communicating again, and J.T. began putting money on Samford's account and sending him care packages on a regular basis. Their communications immediately returned to being romantic in nature, with Samford calling J.T., "beautiful," "gorgeous," "wonderful," and repeatedly saying, "I love you."

During this same time period, Samford rekindled a romantic relationship with an ex-girlfriend living in Texas. The ex-girlfriend also began to put money on Samford's account. Samford and his ex-girlfriend began communicating regularly through calls, chats, and video visits. Samford told his ex-girlfriend that he did not intend to stay in Idaho after his release and that he wanted to return to Texas and be with her.

After several weeks of being incarcerated, Samford decided to tell J.T. that he planned to go back to Texas and be with his ex-girlfriend after he was released from custody. When he told his ex-girlfriend he had done that, she questioned whether that was the best decision for his case. During a phone call, Samford and his ex-girlfriend decided it would be more beneficial for his case if he kept J.T. closer rather than push her away. After having that conversation with his ex-girlfriend, Samford continued to cultivate his relationship with J.T., and she continued to put money on Samford's phone account and send him care packages. J.T. also sent pictures of almost-naked models to Samford so that he could sell them to other inmates. During this time period, Samford also continued to send messages to his ex-girlfriend stating he loved her and would be coming home to her.

The preliminary hearing was held the following month. J.T. testified on cross-examination to remembering "very, very little" about any altercation. She stated she had been drinking the evening of the incident, was "really intoxicated," and described the altercation as follows:

> The only way I knew how to describe it is it's like see [sic] shadows moving behind a sheet, so it's really hard to describe what my memory is. Little flashes. So I guess what I remember at one point he was on top of me, and I remember

4

calling out like I don't know how many times to my--I have a smart home, so to Siri, and I briefly remember getting away. And that's it, basically.

J.T. testified that she knew she spoke to officers the night of the incident but did not remember what she said. On redirect, J.T. testified that she knew Samford was "straddling" her and she had a "really hard time breathing." When asked why she had a hard time breathing, she stated, "I don't know where his hands were so I'm not sure, but I know that I couldn't get breath into my lungs." She testified she was lying on her back on the floor of her bedroom and Samford was on top of her. She testified it was "just kind of a blur" but that "all the weight was situated . . . on [her] torso." J.T. recalled going to the hospital four days following the incident but claimed not to remember what she said to the nurses. The State relied primarily on medical records to meet the standard of probable cause, and the case was bound over on both counts to the district court.

After the case was set for trial, Samford continued his fake relationship with J.T. J.T's texts to Samford demonstrated her support for his defense in the case. For example, she wrote that "the investigator for your attorney just called! I have to call them back still but wanted to let you know :) :) I'm excited to have someone on your defense team who is allowed to talk to me. Love you xoxo." Samford replied, "yay!!!! just don't tell me anything baby I'll find out from my attorney I'm sure. I love you! its [sic] great to know we're gonna see some progress finally and hopefully it should be good news!" The same day, J.T. told Samford she felt her conversation with the investigator in the public defender's office went well and Samford responded, "well yay!!! hopefully that means something good as far me coming home then babe!!! :)."

The following day, J.T. questioned Samford about his intentions:

> My biggest fear is that you're only being sweet to me to get what you need and that you don't actually want to be with me when you get out. That you'll just save up enough to get back to Houston then get back together with her like I mean nothing to you.

Samford responded:

> yes baby [the ex-girlfriend] and I are done, and I am coming home to you! its [sic] not that I didn't want to type more I'm just trying to type fast enough to save money. but yes babe I am sure and you myself and [your dog] will build a life together including a personal puppy house for the munckin [sic].

The next day, Samford wrote to the ex-girlfriend:

> I left you voicemail to clarify what I meant. you know I stumble over words sometimes babe. I LOVE YOU so so much. pleeeease don't let my fumble of

5

words get in your head. You are all I want and need. once the defense has what we need I will stop all contact. hell if it means we can be together I'd tell her everything regardless if it meant time or not just to prove I'm telling the truth and I love you so much. message me when you can or leave short voicemail. I'm sorry I made you sad but it wasn't lie again as you thought. not in that sense. I had guys who had her photos and tried to return them and I denied it. I love you beautiful.

Several days later, Samford sent a message to his ex-girlfriend, stating: "you know I can't cut her off completely just yet until its certain she can't [f***] up my life. I thought we were on the same page with that in order for me to be on a plane and get home?" In the next message, Samford wrote: "you know the degree of crazy she is and the power she has on my life right now until were [sic] told otherwise. . . . which is why the only lies i woukd [sic] tell are to her and not anyone else."

About a month later, J.T. learned what Samford had been doing and confronted him about it during a video visit. Samford admitted he had been untruthful because he was "scared." When J.T. asked him why, he answered: "Scared that you weren't being honest about the whole anti-prosecution thing." Samford apologized, stating, "I'm sorry I let it go on this long. I'm sorry that I didn't tell you sooner . . . I really am." J.T. responded: "I hate that I still love you."

Prior to trial, the State moved in limine to admit J.T.'s prior statements based on the doctrine of forfeiture by wrongdoing, under which a party forfeits hearsay and confrontation objections to admissibility by wrongful conduct designed to deprive an opposing party of the live testimony of a witness. The State argued that Samford's "repeated and enduring manipulation resulted in [J.T.] testifying at the preliminary hearing that she has very little memory of what happened on the date of the incident," and through "influence and misdirection" Samford "persuaded [J.T.] from giving truthful testimony in an open courtroom."

The district court conditionally granted the motion, reasoning I.R.E. 804(a)(3) specifically requires that the declarant testify to his or her lack of memory. *See Milburn v. State*, 135 Idaho 701, 708, 23 P.3d 775, 782 (Ct. App. 2000). In ruling on the motion, the district court applied a four-step forfeiture by wrongdoing analysis and concluded: (1) a determination of whether J.T. was available as a witness would have to be made at trial; (2) the evidence demonstrated Samford had been manipulating J.T. with his expressions of love and devotion to coerce her into thinking that if she did not testify against him, he would return home to her, which is a sufficient showing of wrongdoing; (3) the evidence established Samford's intent to procure J.T.'s unavailability as a

6

witness; and (4) if J.T. was unavailable at trial, it was caused by Samford's wrongdoing. The district court cautioned that, "if [J.T.] testifies at trial consistent with her preliminary hearing testimony, the Court will find her unavailable for purposes of offering testimony on the subject matter of the incident."

At trial, the State called J.T. as a witness. The State moved for an official ruling on the motion regarding forfeiture by wrongdoing based on J.T.'s testimony that she was unable to remember very much about the altercation, had no memory of how she got away from Samford or her interactions with the paramedics, and could not remember any specific questions or answers to or from the police. The district court granted the State's motion and admitted the following evidence based on that ruling: a redacted recording of J.T.'s interview with the detective the day after the altercation, a redacted on-body video of J.T.'s statements to the responding officer the night of the altercation, and J.T.'s statements made to medical personnel four days after the altercation, as reflected in the medical records.

Samford testified in his own defense. On cross-examination the prosecutor asked Samford if J.T. sent him naked pictures to sell while incarcerated. Samford objected on grounds of relevance, unfair prejudice, and beyond the scope of direct. The district court overruled the objection, and Samford testified J.T. sent him pictures of almost-naked models that he used to barter for items with other inmates.

Samford was found guilty of attempted strangulation and felony domestic violence or battery. Samford appeals.

## II.

## STANDARD OF REVIEW

When evaluating the trial court's evidentiary rulings, we review questions of relevance de novo. *State v. Jones*, 167 Idaho 353, 358, 470 P.3d 1162, 1167 (2020); *State v. Aguilar*, 154 Idaho 201, 203, 296 P.3d 407, 409 (Ct. App. 2012). A trial court's determination of prejudice under I.R.E. 403 will not be disturbed on appeal unless it is shown to be an abuse of discretion. *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991); *State v. Clark*, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct. App. 1989). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such

7

discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

Where a defendant claims that his right to due process was violated, we defer to the trial court's findings of fact, if supported by substantial evidence. *State v. Smith*, 135 Idaho 712, 720, 23 P.3d 786, 794 (Ct. App. 2001). However, we freely review the application of constitutional principles to those facts found. *Id.*

## III.

## ANALYSIS

### A. J.T.'s Statements to Detective

Samford asserts the district court abused its discretion when it admitted the statements J.T. made to the detective when she was interviewed the day after the altercation. Samford contends the statements were inadmissible hearsay.[1] The State responds that Samford has failed to show error in the district court's determination that J.T.'s statements were admissible pursuant to the exception in I.R.E. 804(b)(5). We hold that the district court correctly concluded that J.T.'s statements to the detective were admissible because J.T. was unavailable as a witness as a result of Samford's wrongdoing, thereby qualifying for the exception in I.R.E. 804(b)(5).

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. I.R.E. 801(c); *State v. Gomez*, 126 Idaho 700, 704, 889 P.2d 729, 733 (Ct. App. 1994). Hearsay is inadmissible unless otherwise provided by an exception in the Idaho Rules of Evidence or other rules of the Idaho Supreme Court. I.R.E. 802.

The district court admitted J.T.'s statements to the detective pursuant to the doctrine of forfeiture by wrongdoing; that doctrine is reflected in I.R.E. 804(b)(5). This rule provides that "a statement offered against a party that wrongfully caused--or acquiesced in wrongfully causing--the declarant's unavailability as a witness, and did so intending that result" is not subject to exclusion by the rule against hearsay. Thus, the exception applies when a defendant (1) engages or

---

[1] Samford also claimed, in the alternative, that admission of J.T.'s statements to the detective violated the Confrontation Clause. Samford withdrew this claim at oral argument.

acquiesces in wrongdoing; (2) that was intended to render the declarant unavailable as a witness; and (3) that did, in fact, render the declarant unavailable as a witness. *See United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005); *see also* I.R.E. 804(b)(5) (defining statements that are not hearsay). The district court found that each of these criteria were satisfied in this case.

### 1.     Unavailability of J.T. as a witness

Samford contends that the district court failed to apply the correct legal standard or exercise reason in its analysis when it determined that J.T. was unavailable as a witness. A declarant is considered to be unavailable as a witness if the declarant "testifies to not remembering the subject matter." I.R.E. 804(a)(3). Samford argues that the district court erred in concluding J.T. was unavailable because J.T. did not testify that she had no memory of the subject matter. In support, Samford notes that J.T. remembered "the altercation and certain events that transpired, such as calling out to Siri to call 911, where she was positioned on the floor, feeling Mr. Samford on top of her, and that she was having trouble breathing."

Samford made this argument below and the district court properly rejected it. When reviewing the district court's determination, the following is instructive on what it means to be unavailable due to a lack of memory:

> A typical witness testifies to a variety of matters. Rule 804(a)(3) should plainly apply to such a witness who remembers three out of four matters, but has forgotten the fourth. If there is a qualifying hearsay statement by the witness that details the fourth matter, Rule 804(a)(3) paves the way for its admission. There is no reason this analysis should not also apply when a witness testifies about an event, but has forgotten a detail about that event that is captured in the witness' hearsay statement. In such circumstances, as long as the witness testified to having forgotten the detail, she has satisfied the rule's requirement that she testify to not remembering the "subject matter" to which her statement pertains.

30B CHARLES ALAN WRIGHT & JEFFREY BELLIN, FEDERAL PRACTICE AND PROCEDURE, § 6966 (2024 ed.). That J.T. testified she remembered certain events does not deem her available for all purposes in conducting an analysis under I.R.E. 804(a)(3). The relevant subject matter for purposes of determining the admissibility of J.T.'s statements to the detective with respect to Samford's criminal conduct was whether he battered or attempted to strangle J.T. This is analogous to the example above where the witness is considered unavailable when she forgets the details of a fourth matter, but the details are captured in the witness's hearsay statement. Similarly, here, J.T. was unavailable when she testified to remembering some events but did not remember

9

whether Samford attempted to strangle her. J.T's statements on that subject were captured during her interview with the detective the day following the altercation. The district court did not abuse its discretion in concluding J.T. was unavailable as a witness as defined in I.R.E. 804(a)(3).

### 2.      Whether Samford caused J.T.'s unavailability

Samford next argues the district court did not act consistently with the applicable legal standards and did not exercise reason when it determined Samford caused J.T.'s unavailability. Samford specifically takes issue with the district court's reliance on *New York v. Byrd*, 855 N.Y.S.2d 505 (N.Y. App. Div. 2008), in which the appellate court found no error in the trial court's admission of the declarant's grand jury testimony after determining that she was unavailable as a witness. In that case, the defendant was arrested and charged with one count of attempted murder, three counts of first degree assault, and one count of second degree assault after attacking his wife. *Id.* at 507. The wife was initially cooperative with the prosecution and testified before the grand jury and gave the police physical evidence. However, she subsequently stopped cooperating and stated she would refuse to testify at trial. *Id.* A hearing was held to determine whether to admit the wife's grand jury testimony in the event she refused to testify against the defendant at trial. The wife testified she received many calls from the defendant during his incarceration, which the trial court noted violated a protection order. The wife stated the defendant requested money for the prison commissary, told her he loved her, expressed his regret, and stated he wanted their family to stay together. An expert witness also testified regarding battered person syndrome, and the court concluded the wife suffered from that syndrome. *Id.* The wife subsequently refused to testify at trial and the court admitted her grand jury testimony under the doctrine of forfeiture by wrongdoing. *Id.* at 510. No error was found on appeal.

The district court analogized this case to *Byrd*, noting the evidence demonstrated Samford manipulated J.T. with expressions of love and his intention to return home to her. The district court reasoned this conduct was a means of maintaining control over J.T. Similar to *Byrd*, the district court also noted that Samford initially violated the no-contact order. Samford contends *Byrd* is distinguishable because, unlike the wife in *Byrd*, J.T. does not suffer from battered person syndrome; Samford did not engage in hostile or abusive behavior; there is no evidence of a history of domestic abuse; and although he initially violated the no-contact order, he did not make hundreds of phone calls to J.T. while incarcerated as did the defendant in *Byrd*. Samford further

10

asserts the messages between him and his ex-girlfriend do not support the district court's determination that he intended to prevent J.T. from testifying; rather, he argues the communications "evidence a concern that [J.T.] will be vengeful and not testify truthfully."

These arguments are unpersuasive. While the court in *Byrd* "acknowledged the long history of abuse," it "took pains to clarify that the decision was based only on defendant's actions subsequent to the attack." *Id*. at 509. Further, the court's decision was not based on the wife suffering from battered person syndrome; the court noted that the evidence about battered person syndrome "was relevant to place defendant's actions in context to show that he had such a degree of control over [his wife]." *Id*. at 510. When concluding the government had proven by clear and convincing evidence that the defendant's misconduct induced his wife's unavailability to testify, the court reasoned the government "need not demonstrate that the defendant's sole motivation is to procure the witness's unavailability" and that it is enough if a desire to silence the witness motivated the defendant in part. *Id*. Moreover, the wrongful conduct need not consist of hostile or abusive behavior:

> Given the obligation of citizens to testify when called upon to do so, any action that causes them to forsake this obligation typically qualifies as wrongdoing. Thus, the rule's breadth appears intended to capture conduct, such as pressuring or tricking witnesses into not testifying, even when that pressure would not itself constitute a crime.

30B WRIGHT & BELLIN, § 7033.

The district court's finding that Samford caused J.T.'s unavailability is supported by substantial and competent evidence. For example, the district court considered the following exchange between Samford and his ex-girlfriend after Samford revealed he had told J.T. he planned to go back to his ex-girlfriend after his release:

| [Ex-girlfriend]: | Maybe you should just send her a message and say, 'you know, the more I think about it, the more I'm just not sure.' |
| [Samford]: | Yeah. |
| [Ex-girlfriend]: | I mean do whatever you think, but yeah--I would try to keep her closer than further [sic]. |
| [Samford]: | Okay. |
| . . . . | |
| [Samford]: | I just, I've just been telling her the truth because don't know if she's still talking to [a friend] or my mom or whatever--I'm actually just trying to be truthful. But if |

11

|                  |                                                                                                                      |
| :--------------- | :------------------------------------------------------------------------------------------------------------------- |
|                  | you're okay with me, you know, doing that to keep things favorable, then--                                            |
| [Ex-girlfriend]: | It's not like, I'm not sitting here saying tell her lies, or whatever, but like--                                     |
| [Samford]:       | Yeah get it.                                                                                                          |
| [Ex-girlfriend]: | Okay good deal.                                                                                                       |
| [Samford]:       | As long as you know, that, you know, whenever I'm out I'm coming straight home to you though.                         |
| [Ex-girlfriend]: | Yeah. I don't know what you say, I don't want to know, do whatever you need to do, um, like, you just need to get out--yeah. |
| [Samford]:       | Yeah.                                                                                                                 |

Following this, Samford continued to cultivate his fake relationship with J.T. They maintained regular contact and spent hours on the phone, texting, and video chatting. He continued to tell J.T. he loved her and addressed her as "babe" and "beautiful." J.T. continued to put money on Samford's phone account and send him care packages. After J.T. expressed to Samford that she felt the conversation with an investigator in the public defender's office went well, Samford replied to that message with: "well yay!!! hopefully that means something good as far me coming home then babe!!! :)."

The district court also considered Samford's statements to his ex-girlfriend during this time period, such as: "once the defense has what they need I will stop all contact [with J.T.]"; "I'm doing only what I feel keeps the status quo till my attorney tells me it no longer matters"; "you know I can't cut her off completely just yet until its [sic] certain she can't [f***] up my life"; and, "the only lies i woukd [sic] tell are to her and not anyone else."

The district court's finding that Samford engaged in wrongdoing that procured J.T.'s unavailability is supported by substantial and competent evidence. The evidence shows that Samford engaged in conduct intended to manipulate J.T. into not testifying.[2] While this Court concludes Samford's characterization of his communications with his ex-girlfriend as merely evidencing "a concern that [J.T.] will be vengeful and not testify truthfully" as disingenuous, even

---

[2] During oral argument, Samford's counsel argued that J.T.'s awareness of Samford's conduct after she confronted him about it should be considered when determining whether Samford caused J.T.'s unavailability. That J.T. discovered, prior to trial, that Samford had been lying to her about the future of their relationship does not change that Samford's motivation in lying to J.T. in the first instance was for the purpose of procuring J.T.'s unavailability at trial.

if that motivation is taken into consideration, the State need not demonstrate that Samford's sole motivation was to procure J.T.'s unavailability. The above communications demonstrate Samford's desire to silence J.T. was part of his motivation. Samford fails to show error in the district court's admission of evidence under the doctrine of forfeiture by wrongdoing as provided in I.R.E. 804(a)(3).

**B.     Medical Records**

Samford asserts the district court abused its discretion in admitting the medical records that contain statements J.T. made to the nurse regarding Samford's identity. Specifically, one medical record indicates that J.T. reported the "alleged physical abuse on Saturday at her house with her and her significant other" and that her "boyfriend tried to 'strangle her.'" Samford contends the statements include two layers of hearsay and were improperly admitted. Samford argues that the first layer is J.T.'s statements to the nurse, and the second layer is the nurse's notations, which Samford contends are inadmissible under the business-records exception. Because this Court concludes J.T.'s statements are admissible pursuant to the forfeiture by wrongdoing exception in I.R.E. 804(a)(3), Samford's argument on the first layer of hearsay fails.

Turning to Samford's argument on the second claimed layer of hearsay, we first address the State's argument that Samford failed to preserve his appellate argument on this point. Appellate court review is limited to the evidence, theories, and arguments that were presented below. *State v. Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017). A party's specific arguments may evolve over time without raising preservation concerns so long as the substantive issue was properly raised before the trial court. *State v. Hoskins*, 165 Idaho 217, 224, 443 P.3d 231, 238 (2019); *State v. Gonzales*, 165 Idaho 95, 98, 439 P.3d 1267, 1270 (2019). A party preserves an issue for appeal by properly presenting the issue with argument and authority to the trial court and noticing it for hearing *or* if the trial court issues an adverse ruling. *State v. Miramontes*, 170, Idaho 920, 924-25, 517 P.3d 849, 853-54 (2022). Both are not required. *Id*. at 925, 517 P.3d at 854.

When the State moved to admit the medical record, Samford objected, stating, "I am going to make the same 403 objections, expert objections and, like I said, foundation." The State argued in response that "it's all a part of the medical record. It's admitted under business records, but also it's a certified medical record." The district court overruled Samford's objection, reasoning that

13

"the State cares about the symptoms. That is like medical diagnosis and treating exception under the hearsay rule, and then they can incorporate it into the next layer of hearsay as a business record, as part of a business record." The State argues that Samford's general trial objection did not preserve the issue for appeal. We conclude the district court's ruling preserved the issue for appeal and will, therefore, address the merits of Samford's challenge to the second layer of hearsay he claims.

The requirements for admission of evidence under the business records exception are provided in I.R.E. 803(6). Those requirements are: (1) "the record was made at or near the time by--or from information transmitted by--someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; and (3) "making the record was a regular practice of that activity." I.R.E. 803(6)(A)-(C). J.T.'s treating physician testified that the medical records contain notes from the whole team in the emergency department and that he relies on the notes prior to talking with the patient, noting the triage nurse usually writes down the chief complaint of the patient. Samford fails to show the district court abused its discretion when admitting the entire medical record under the business records exception.

Even assuming any error in the admission of J.T's statements identifying Samford as her assailant, the error is harmless. Error is not reversible unless it is prejudicial. *State v. Stell*, 162 Idaho 827, 830, 405 P.3d 612, 615 (Ct. App. 2017). Where a criminal defendant shows an error based on a contemporaneously objected-to, nonconstitutional violation, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt the error did not contribute to the jury's verdict. *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017). Thus, we examine whether the alleged error complained of in the present case was harmless. *See id.* Harmless error is error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020). This standard requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error. *Id.* If the error's effect is minimal compared to the probative force of the record establishing guilt beyond a reasonable doubt without the error, then the error did not contribute to the verdict rendered and is harmless. *Id.* The reviewing court must take into account what effect

the error had, or reasonably may have had, on the jury in the context of the total setting and in relation to all else that happened, which necessarily includes the evidence presented. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

The probative force of the alleged error regarding J.T.'s medical records was minimal given Samford is identified as the man with whom the altercation occurred through other admissible evidence, such as J.T.'s statements to the responding officers, during her interview the following day, and during her testimony. Any alleged error is, therefore, harmless.

## C.    Admission of Pictures J.T. Sent to Samford

Samford contends the district court failed to apply the correct legal standards by permitting the prosecutor to cross-examine him regarding J.T. sending him pictures of almost-naked models to sell or use for barter. He asserts the evidence was irrelevant and unfairly prejudicial. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. I.R.E. 401. Relevant evidence is generally admissible. I.R.E. 402. While relevant evidence is generally admissible, it may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. I.R.E. 403. In other words, evidence should be excluded if it invites inordinate appeal to lines of reasoning outside of the evidence or emotions which are irrelevant to the decision-making process. *State v. Reyes*, 169 Idaho 781, 791, 503 P.3d 997, 1007 (2022).

The district court held a bench conference off the record to discuss Samford's objections to testimony about the pictures--specifically relevance, unfair prejudice, and beyond the scope of direct. The district court made its ruling when it went back on the record. In allowing the State to elicit testimony regarding the pictures, the district court stated, "I ultimately held that they would be relevant to show the--to impeach [J.T.] in terms of the degree to which she was willing to help [Samford] and to just show the level of their confederation, so to speak, here." Samford asserts the testimony is irrelevant for this purpose because J.T. had already testified as to her willingness to help Samford. However, proof of bias is almost always relevant because the jury, which is tasked with findings and weighing credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony. *State v. Thumm*, 153 Idaho 533, 540, 285 P.3d 348, 355 (Ct. App. 2012). That there was additional evidence to show bias does not negate the relevance of the evidence that J.T. was willing to send pictures to Samford that

15

he could use for bartering purposes. The district court did not err in determining that the challenged evidence was relevant as impeachment evidence for the purpose of showing J.T.'s bias.

Samford also argues the testimony was irrelevant because it "provided no insight as to the actions on the dates the alleged battery and attempted strangulation occurred." As revealed by the district court's comments, the testimony was not admitted on this basis. Rather, the district court ruled the challenged evidence was relevant to show J.T.'s bias in favor of Samford. Samford fails to show the district court erred in that ruling.

Samford next contends that, even if the evidence was relevant, the district court still abused its discretion by admitting the evidence because, he claims, the district court did not act consistently with the applicable legal standards. Specifically, Samford contends the district court failed to conduct the balancing test required by I.R.E. 403 and did not exercise reason because it failed to properly weigh the danger of unfair prejudice against the probative value of the evidence. The State responds this argument is not preserved for appeal. Evidentiary objections must clearly state the specific ground for the objection, unless the basis for the objection is apparent from context. *State v. Hall*, 163 Idaho 744, 772, 419 P.3d 1042, 1070 (2018). Objections to the admissibility of evidence on one basis do not preserve separate and different bases for exclusion. *Id*. Thus, a party can fail to preserve an evidentiary issue for appeal not only by failing to make a specific objection, but also by making a different objection than the one raised on appeal. *See United States v. Iglesias*, 535 F.3d 150, 158 (3d Cir. 2008) (holding objection that the best evidence available is on the witness stand did not preserve a hearsay objection to introduction of the witness's prior statement).

Samford's arguments on appeal are somewhat inconsistent. On the one hand, Samford first argues the district court failed to conduct the balancing test required by I.R.E. 403 ("the district court did not act consistently with the applicable legal standards because the district court did not conduct the balancing test"). On the other hand, in his second argument, Samford contends the district court improperly conducted the balancing test ("the district court did not exercise reason because, if properly weighted, the danger of unfair prejudice from this testimony substantially outweighed any limited probative value").

When the district court went back on the record to make its ruling on Samford's objection, it stated with respect to the bench conference that Samford "argued [testimony regarding the

pictures] was unduly prejudicial." The district court subsequently overruled the objection. After the district court's ruling, defense counsel did not object on the basis that the district court failed to conduct the balancing test required by I.R.E. 403. This objection could not conceivably be made prior to the district court's ruling on the motion. We conclude the first argument is not preserved for appeal.

However, Samford's initial objection on the basis that the testimony was "unduly prejudicial" suffices to preserve his second argument that the district court did not exercise reason because it failed to properly weigh the danger of unfair prejudice against the probative value of the evidence. Samford was not required to renew this objection after the district court's ruling. "Once the court rules definitively on the record--either before or at trial--a party need not renew an objection or offer of proof to preserve a claim of error for appeal." I.R.E. 103(b). Implicit in the district court's consideration of and ruling on Samford's objection is that the district court found the evidence was not unfairly prejudicial.

Samford contends the probative value of the evidence was minimal because it had no bearing on the credibility of J.T. He further argues the evidence was unfairly prejudicial because it allowed the State to portray him in an unfavorable light based on J.T.'s conduct. These arguments are unpersuasive. First, we agree with the district court's decision regarding the relevance of the evidence to show J.T.'s bias "in terms of the degree to which" J.T. was willing to help Samford. Second, we disagree with Samford that it was J.T.'s conduct in sending him the pictures that portrayed him in an unfavorable light. It was both Samford's conduct in accepting the photos and then using them to barter for items and selling the pictures that would result in any such portrayal. The district court did not abuse its discretion in weighing the danger of unfair prejudice against the probative value of the evidence.

## D.     Cumulative Error

Samford also contends that the cumulative error doctrine applies here, necessitating a reversal of his conviction. Under the doctrine of cumulative error, a series of errors (harmless in and of themselves) may in the aggregate show the absence of a fair trial. *State v. Adamcik*, 152 Idaho 445, 483, 272 P.3d 417, 455 (2012). However, a necessary predicate to the application of the doctrine is a finding of more than one error. *Id.* Samford has failed to demonstrate at least two

17

errors, a necessary predicate to the application of the cumulative error doctrine. As such, Samford has failed to show he is entitled to application of the cumulative error doctrine.

## IV.
## CONCLUSION

Samford has failed to show the district court abused its discretion in admitting evidence pursuant to the doctrine of forfeiture by wrongdoing set forth in I.R.E. 804(a)(3). Samford has failed to show the district court abused its discretion in admitting the entire medical record under the business records exception--even assuming error in the admission of the entire medical record, any error was harmless. Samford has also failed to show the district court abused its discretion in admitting testimony from Samford regarding J.T. sending him photos to use for bartering. Additionally, Samford is not entitled to relief based on cumulative error. Therefore, Samford's judgment of conviction for attempted strangulation and felony domestic violence or battery is affirmed.

Judge HUSKEY and Judge TRIBE, **CONCUR**.